THE BOARD OF EDUCATION OF COMMUNITY HIGH SCHOOL DIS-
TRICT No. 94 *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. THE RE-
GIONAL BOARD OF SCHOOL TRUSTEES OF DU PAGE COUNTY *et al.*,
Defendants-Appellants and Cross-Appellees.

Second District   No. 2—91—1361

Opinion filed December 31, 1992.—Rehearing denied March 12, 1993.—
Modified opinion filed March 17, 1993.

James E. Ryan, State's Attorney, of Wheaton (Keith E. Letsche, Assistant State's Attorney, of counsel), for appellant Regional Board of School Trustees of Du Page County.

Michael J. Duhig, of Oak Brook, for other appellants.

William E. Jegen, P.C., of Glen Ellyn (William E. Jegen, of counsel), and Justino D. Petrarca, of Scariano, Kula, Ellch & Himes, Chartered, of Chicago, for appellees.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant Regional Board of School Trustees of Du Page County (Regional Board or Board) granted a petition to change school district boundaries. Plaintiffs, West Chicago Elementary School District 33 and Community High School District No. 94 (collectively, respondent school districts or school districts), sought administrative review of the Board's order granting the petition. The circuit court of Du Page County ultimately entered an order reversing the decision of the Regional Board. The Board and defendant petitioners now appeal from that order.

Petitioners reside in the Fox Hollow subdivision, which lies in the City of Warrenville. Of the 190 single-family homes in the subdivision, 157 are located in school districts No. 33 and No. 94, and 33 homes are located in Community Unit School District No. 200. The specific area where petitioners live is situated along a portion of the southern border of the respondent school districts, between the Elgin, Joliet and Eastern Railroad tracks and Route 59. District No. 200 lies immediately adjacent, to the south. The area is bordered on the west and northwest, beyond the railroad tracks, by Fermi National Accelerator Laboratory (Fermilab). To the north it is bordered by Blackwell Forest Preserve, and on the east by single-family homes and Route 59. The area is served by the West Chicago Fire Protection District and, at least in part, by the West Chicago Park District.

Petitioners filed a petition with the regional superintendent of schools seeking to detach their property (petitioning territory) from District No. 94 and District No. 33 and to annex the area to District No. 200, which is often referred to as the Wheaton-Warrenville District. Pursuant to section 7—6 of the School Code (Ill. Rev. Stat. 1989, ch. 122, par. 7—6), the petition designated a committee of 10 as attorney-in-fact for the 190 Fox Hollow residents who executed the petition.

On February 5, 1990, the Regional Board commenced an administrative hearing. Petitioners presented evidence in support of the petition while Districts No. 33 and No. 94 objected and offered evidence in opposition to it. In all, during the seven-month period of the hear-

ing, 39 witnesses testified and more than 50 exhibits were presented. On October 1, 1990, the Board voted five to one to grant the petition. The respondent school districts then filed a complaint for administrative review.

On January 2, 1991, the Regional Board filed a motion in the trial court to strike and/or dismiss certain portions of the respondent school districts' complaint in administrative review. The school districts parried with a motion to strike the Regional Board's motion, alleging essentially that the Board lacked standing to appear and defend its decision in the administrative review proceedings. Following a hearing, the trial court held that the Regional Board was without authority to defend its position. Accordingly, the court entered an order striking the Board's motion and barring the Board from participating in the administrative review proceedings except as required by the Administrative Review Law.

On November 1, 1991, the trial court reversed the order granting the detachment and annexation petition on the ground that the Board's decision was against the manifest weight of the evidence. Petitioners brought this timely appeal. The Regional Board joined the petitioners' appeal and also filed a separate appeal from the trial court's order barring it from the administrative review proceedings. The respondent school districts filed a cross-appeal.

■■ The school districts' first contention on cross-appeal is that the Regional Board lost jurisdiction to hear the petition when a member of the committee of 10 moved out of the petitioning territory. Section 7—6 of the School Code provides:

"When a petition contains more than 10 signatures the petition shall designate a committee of 10 of the petitioners as attorney in fact for all petitioners ***." (Ill. Rev. Stat. 1989, ch. 122, par. 7—6.)

Plaintiffs urge that the statute imposed jurisdictional limits which precluded the Board from deciding a case when the committee membership fell below the statutory number. This argument cannot be sustained.

The number of signatures of registered voters called for by the statute on a detachment petition is a jurisdictional requirement. (See *Board of Education of Avoca School District No. 37 v. Regional Board of School Trustees* (1980), 82 Ill. App. 3d 1067, 1070.) We have held that the initial statutory requirement that there actually be 10 members on a committee of 10 is jurisdictional also. In *Betts v. Regional Board of School Trustees* (1986), 151 Ill. App. 3d 465, 467-68, a case relied upon by the respondent school districts, we determined

that the regional board never acquired jurisdiction because one member of the committee had not signed the petition. However, contrary to plaintiffs' argument, nowhere in *Betts* did we find that the committee was required to remain totally intact throughout the pendency of the proceedings on the petition.

Plaintiffs argue, by analogy, that *Avoca* requires a finding that the Regional Board lost jurisdiction. The *Avoca* court observed that the requirement for signatures of two-thirds of the voters of the petition area applies both at the time a regional board first takes a petition under consideration and at the time of final action on the petition. However, the *Avoca* court's determination is well supported by the implication in the statute that jurisdiction remains only so long as the petition is consented to by two-thirds of the voters in the petitioning territory. For example, section 7—6 allows for amendment of a petition provided the petition, after amendment, still complies with the signature requirement of the original petition. No comparable requirement is imposed on the committee of 10 upon amendment of the petition.

Section 11A—3 of the School Code, which provides for the designation of a committee of 10 in a petition to form a unit school district (Ill. Rev. Stat. 1989, ch. 122, par. 11A—3), is instructive in regard to this question. That section contains a definition of a vacancy on a committee of 10 and a mechanism for filling such a vacancy. The legislature did not include any such definition or mechanism in section 7—6. However, the very provision of a method for dealing with the situation indicates legislative recognition that vacancies can and will occur on committees of 10 and that, at least in the context of section 11A—3, perfect maintenance of such a committee is not a jurisdictional requirement. Absent any language in section 7—6 to indicate otherwise, section 11A—3 is persuasive that loss of a committee of 10 member in a section 7—6 proceeding is not tantamount to loss of jurisdiction.

Depending on the size and nature of the detachment area in a given case, there could be an unwieldy number of petitioners if all of them were expected to act as a committee of the whole on all issues. However, the statute indicates that the committee of 10 may make stipulations binding on all petitioners as to any questions regarding the petition or hearing. It appears the legislature recognized that, when more than 10 petitioners are involved, they need to be able to act through representatives. When the committee is viewed in this context we perceive no magic in the number 10 once the jurisdiction of the Regional Board has been established. While the committee must be constituted in conformity with the statute in order to initially

confer jurisdiction, such a committee primarily provides a convenient and effective mechanism to accomplish the task of detachment. That a committee may at some point have fewer than 10 members is not enough to destroy the Board's jurisdiction over the petition. To hold otherwise would be to fail to recognize the realities of a highly mobile society and to potentially defeat the intent of the statute to allow detachment upon petition by the requisite number of voters in the area sought to be detached.

■ The respondent school districts next claim that the decision to grant the detachment petition was void from the outset because the Regional Board failed to adopt rules of practice prior to the administrative proceedings, as required by section 4(a)(1) of the Administrative Procedure Act (Ill. Rev. Stat. 1989, ch. 127, par. 1004(a)(1)). The trial court found that the school districts had not raised this issue during the administrative proceedings and, therefore, were prohibited from raising it on administrative review. The lower court's determination on the issue is correct. The record is devoid of any attempt by the school districts to raise this issue before the Regional Board.

Generally, when a party fails to assert a particular argument during proceedings before an administrative agency, the point is waived and may not be considered on appeal. (*Kaufman Grain Co. v. Director of the Department of Agriculture* (1988), 179 Ill. App. 3d 1040, 1045.) Waiver does not apply, however, when the argument challenges the authority of the administrative forum to adjudicate causes. (*Kaufman*, 179 Ill. App. 3d at 1045.) The school districts take the position that the Regional Board's failure to adopt rules of practice deprived it of jurisdiction, or power, to hear the detachment petition and the Board's order, therefore, was void.

The fatal weakness in plaintiffs' argument is that the Regional Board's power to hear and determine detachment petitions arises, not from any rules the Board itself has or has not promulgated, but from the School Code (see Ill. Rev. Stat. 1989, ch. 122, par. 7–1). The respondent school districts do not dispute the Regional Board's authority under the School Code. The relevant rules of practice are just that and nothing more. They are meant to inform participants about "the nature and requirements of *** formal hearings" (Ill. Rev. Stat. 1989, ch. 127, par. 1004(a)(1)) and would merely explain the structure, sequence, and procedures to be followed during regional board hearings. Such rules are not intended to, nor do they, empower the Regional Board to make any decision or enter any order relevant to a detachment petition. Conversely, the Board's failure to adopt such rules cannot deprive it of power to act on such petitions. Since the Board's au-

thority to hear the petition is not in question, the exception to the waiver rule does not apply, and the plaintiffs are barred from further raising the issue on appeal.

We turn now to the merits of petitioners' appeal. The trial court reversed the Regional Board's decision after finding that it was contrary to the manifest weight of the evidence. It is the role of the regional board, not the court, to make findings of fact and to weigh the relevant factors, and the board's determinations and decisions will not be rejected on administrative review unless they are contrary to the manifest weight of the evidence. (*Board of Education of Golf School District No. 67 v. Regional Board of School Trustees* (1982), 89 Ill. 2d 392, 396; *Skolek v. Utica Grade School District No. 135* (1992), 232 Ill. App. 3d 278, 282.) The reviewing court is not to reweigh evidence or substitute its judgment for that of the regional board. (*Golf,* 89 Ill. 2d at 397.) We review the Regional Board's decision in light of these controlling principles.

■ Section 7—6 of the School Code sets forth the standards to be considered by a regional school board in determining whether to permit a transfer of territory from one school district to another. Section 7—6 provides that the regional board:

> "[S]hall hear evidence as to the school needs and conditions of the territory in the area within and adjacent thereto and as to the ability of the districts affected to meet the standards of recognition as prescribed by the State Board of Education, and shall take into consideration the division of funds and assets which will result from the change of boundaries and shall determine whether it is to the best interests of the schools of the area and the educational welfare of the pupils that such change in boundaries be granted ***." (Ill. Rev. Stat. 1989, ch. 122, par. 7—6.)

It has been well established, and recently reiterated by our supreme court, that under the language of section 7—6 detachment and annexation petitions should be granted only when the overall benefit to the annexing district and the area seeking detachment, considered together, clearly outweighs any detriment to the district losing territory and the surrounding community as a whole. *Carver v. Bond/Fayette/ Effingham Regional Board of School Trustees* (1992), 146 Ill. 2d 347, 356; *Golf,* 89 Ill. 2d at 400-01; *Oakdale Community Consolidated School District No. 1 v. County Board of School Trustees* (1957), 12 Ill. 2d 190, 193-94.

■ A reviewing court applying this benefit-detriment test to a regional board's decision is to consider the following factors: differences

between the facilities and curricula of the school districts, the effect of detachment on the ability of either district to meet State standards of recognition, the distances from petitioners' homes to the schools in both districts, and the impact of shifting boundaries on both districts' tax revenues. (*Carver*, 146 Ill. 2d at 356; *Bowman v. County Board of School Trustees* (1974), 16 Ill. App. 3d 1082, 1085.) The "whole child" and "community of interest" factors may also be taken into account. These include the petitioning area's identification with the annexing district and the community in which that district is located and the attendant probability of beneficial participation in school affairs and extracurricular activities. (*Carver*, 146 Ill. 2d at 356; *Golf*, 89 Ill. 2d at 397-98.) The personal preferences or convenience of the petitioning parents and their children may be considered, but more than personal preference on the part of the petitioners is required to support a change in school district boundaries. *Carver*, 146 Ill. 2d at 346; *Golf*, 89 Ill. 2d at 400; *Oakdale*, 12 Ill. 2d at 193.

In its order granting the detachment petition, the Regional Board indicated that it had considered each of the factors recited in *Carver*. With regard to the first factor, the Board found that the facilities, curricula, and other programs of the detaching and annexing districts were substantially similar. Both the petitioners and the respondent school districts protest this finding, and each of them vigorously insists that the evidence showed the facilities and curriculum of District No. 200 or Districts No. 33 and No. 94, respectively, to be superior. We have reviewed the evidence and find it to be an exhaustive depiction of the facilities, curricula, extracurricular activities, social services, special programs, and faculty and staff in both District No. 200 and Districts No. 94 and No. 33. We believe the Regional Board's finding is not against the manifest weight of the evidence.

With one exception, the record does not disclose significant differences between the physical facilities of the respective districts. District No. 94 has a swimming pool, an amenity not available in District No. 200. Aside from that, the high schools in both Districts No. 200 and No. 94 have ample athletic facilities which accommodate both practice and spectator sports. All of the schools also have ample libraries or resource centers, although these facilities are not all identical or equal in terms of size, resources, and equipment. However, all of the districts also benefit from cooperative programs with the library districts in which they are located.

At the time of the hearing, District No. 94's high school was well below maximum capacity, while District No. 200's two high schools were almost filled and were expected to exceed capacity by 1994,

without students from the petitioning area of Fox Hollow. On the other hand, Pioneer School, the District No. 33 elementary school attended by children in the petitioning territory, was expected to reach capacity in the 1992-93 school year, while District No. 200 was constructing a new elementary school, to be completed in the fall of 1990. The new school would have space for 650 students but projected enrollment of only 500.

Voters in District No. 33 had recently defeated by a two-to-one margin a referendum which would have allowed the construction of a needed new elementary school, while voters in District No. 200 had recently approved a bond referendum and a tax rate increase in the education fund. The defeat of the referendum in District No. 33 had necessitated $250,000 in cuts from the district's education fund and had left the district facing overcrowding and possible program cuts. District No. 200 indicated that it could absorb 44 to 45 children from the petitioning territory without any measurable impact on existing facilities, although more than 45 students could be generated by the petitioning territory.

All in all, as they relate to the quality of the education available to students, the facilities of the various districts, including space considerations, appear to be essentially comparable. While District No. 94's swimming pool is a desirable amenity, it is not enough to say that the district's facilities overall are substantially superior to those of District No. 200.

We reach a similar conclusion regarding the quality of the districts' respective curricula, faculties, special programs, and services. The respondent high school district emphasizes that, unlike District No. 200, it offered abundant, detailed testimony about its mathematics, English, and foreign language departments. It is true that District No. 200 did not present a great amount of detail regarding its comparable departments. However, the Board's task was to evaluate the broad, overall substantive education and educational milieu provided by the districts, not selected educational subject areas. Hence, the evidence regarding District No. 94's specific instructional areas became part of the total tapestry examined by the Regional Board.

That tapestry revealed essentially the same core curriculum in District No. 200 as in Districts No. 33 and No. 94, as well as various special subjects, such as music and art. All the districts also offered advance placement in basic subjects, remedial and enrichment programs, programs for gifted students, participation in special education and vocational education programs, and special help for students with

learning problems, particularly in the one area of reading. Further, the elementary schools offered programs for preschoolers.

All three school districts also provided extracurricular sports programs, particularly at the middle and high school level. The numbers and types of sports were not identical but certainly were comparable. Additional programs were also available to students in all three districts through the local park and library districts, as well as in conjunction with nearby Fermilab. Healthcare, guidance, and counseling were available in all districts, and, at the District No. 94 and District No. 200 high schools, specialized programs aimed at adolescent problems had been developed. With regard to faculty, the overall teacher-to-student ratio was very similar at both the elementary and high school levels, as were the educational and experience levels of the teachers. None of the statistics on these factors were identical, but the differences were so small as to be insignificant.

Finally, the petitioners placed into evidence certified copies of the 1988-89 Illinois school report cards for all three school districts. Plaintiffs contend that the report cards constitute inadmissible hearsay, were not admitted at the hearing for the truth of the matters they set forth, and should not have been considered by the Regional Board. It is not clear whether, in fact, the Regional Board took the school report cards into account. However, we are of the opinion that the Board could properly have done so.

It is well settled that a public or official record may come within an exception to the hearsay rule if it is required by statute or authorized by the nature of the public office. Such records constitute evidence of the matters properly required to be maintained and recorded therein. (*People ex rel. Wenzel v. Chicago & North Western Ry. Co.* (1963), 28 Ill. 2d 205, 211-12; *People v. Rockman* (1986), 144 Ill. App. 3d 801, 810; *People v. Hester* (1980), 88 Ill. App. 3d 391, 395; *Lombard Park District v. Chicago Title & Trust Co.* (1969), 105 Ill. App. 2d 371, 378.) Here, it is not disputed that the Illinois school report cards are prepared by each school district in the State, pursuant to section 10—17a of the School Code (Ill. Rev. Stat. 1989, ch. 122, par. 10—17a), for the purpose of "assessing the performance of its schools and students." The statute not only mandates preparation of the reports but also prescribes in detail the numerous indicators of student performance to be included in them. (See Ill. Rev. Stat. 1989, ch. 122, pars. 10—17a(3)(a), (3)(b).) The form for the report cards is prepared by the State Board of Education and provided to school districts. (See Ill. Rev. Stat. 1989, ch. 122, par. 10—17a(3)(c).) In light of the clear statutory mandate regarding school report cards, the reports involved

here were an exception to the hearsay rule and could have been considered by both the Regional Board and the trial court.

The Illinois school report cards reflect that District No. 200 enjoys a higher graduation rate; higher percentage of graduating seniors going to college; higher student attendance rates; higher ACT scores in English, mathematics, and natural and social sciences; a lower student mobility rate; and a lower percentage of chronic truants. While petitioners assert that these results reflect a superior educational system, there was evidence, including testimony from the superintendent of District No. 200, that test scores by themselves, including ACT scores, are not the best measure of the quality of a school's educational program because schools have different student bodies and other variables must be taken into account. It was pointed out, too, that the graduation rates shown on the report cards were not accurate because they did not take into consideration students who moved in and out of the districts during the year.

With regard to the variables that must be considered, Districts No. 33 and No. 94 were shown to have a higher population of minority students than District No. 200. Many of these students had to deal with significant language barriers, and, due to lack of family income, they needed to work to support themselves. These factors were viewed as responsible, at least in part, for the respondent school districts' lower academic performance as reflected in the school report cards. However, District No. 94 had developed a highly successful program to decrease the Hispanic student dropout rate, Hispanics being the district's largest minority population. Similarly, District No. 33 had developed a special program to identify and assist preschoolers with behavioral, social, or learning problems. Also, the superintendent of District No. 33 testified that group scores for the district in the last few years reflected that the district's students were progressing at a rate of more than one grade level per year.

In terms of the overall quality of the education offered, it is evident that each of the school districts involved here has its advantages and its disadvantages, its strengths and its weaknesses. Where one district may have the edge in one aspect of the educational process, the other district will have the edge in some other aspect. Consequently, while students might secure a particular benefit in one district, they are likely to lose a different benefit they would have enjoyed in the other district. In our opinion, the academic differences between the districts balance out. We perceive no element of facilities, faculty, or programs which definitively tips the scale in favor of either District No. 200 or Districts No. 33 and No. 94. The Regional Board's

conclusion that the districts' facilities are substantially similar is well supported by the evidence.

As for the second factor prescribed by the *Carver* court, witnesses for all three districts testified that detachment and annexation would not affect the respective districts' ability to meet the statutory standards of recognition. No issue is raised regarding this factor.

The next criterion addresses the effects of detachment and annexation on the various districts' tax revenues. The Regional Board found that detachment would not financially affect the respondent school districts so as to seriously interfere with their operations. Detachment and annexation inevitably result in the loss of assessed valuation and tax revenues in the district losing part of its territory. However, whether a detaching district will remain financially healthy and capable of meeting the statutory standards for recognition is more important than the size of the loss of assessed valuation and tax revenues the district must bear. (*Board of Education of Golf School District No. 67 v. Regional Board of School Trustees* (1982), 89 Ill. 2d 392, 401.) As we mentioned, detachment and annexation will not affect the ability of any of the districts to meet statutory standards for recognition. The record is persuasive that the financial stability and status of Districts No. 33 and No. 94 will not be significantly impaired, either.

The record reflects that detachment would result in a 2.3% loss of assessed valuation in District No. 33 and 1.7% in District No. 94. In dollars, District No. 33 would lose about $196,000 a year and District No. 94 would lose about $101,000 a year. Petitioners point out that a loss of 2.4% of assessed valuation did not warrant reversal of an order for detachment in *Board of Education of Avoca School District No. 37 v. Regional Board of School Trustees* (1980), 82 Ill. App. 3d 1067. Plaintiffs respond that the district losing territory in *Avoca* was not taxing at its maximum rates and could increase those rates to make up for the loss. In contrast, according to plaintiffs, District No. 33 is levying at the maximum rate in every fund that has a rate limit.

While District No. 33's ability to increase tax rates without a successful referendum is limited, the district is growing. The evidence shows that, in addition to residential construction, there are industrial and commercial projects under development or planned in the two districts. At least some of this development is apparently producing revenue. Based on all sources of revenue, District No. 33 was anticipating a 10% increase in revenue in the next fiscal year, for a total of $1 million, and District No. 94 was expecting an increase of $350,000. Neither district was operating at a deficit, although District No. 33

had reduced the budget in its education fund as a result of the defeat of its referendum.

While they acknowledged increases in revenue, the superintendents for both Districts No. 33 and No. 94 suggested that there probably would be a net loss due to increased expenses, and the revenue loss would result in changes or cutbacks in programs and/or increases in class size. However, the witnesses did not delineate any specific cuts which would be made. District No. 94's superintendent indicated that only ancillary or cocurricular programs or services were likely to be negatively impacted. The District No. 33 school board president indicated that the Board had not focused on either program cuts or increased class sizes but was reviewing the overall financial status of the district.

In summary, neither District No. 33 nor District No. 94 is facing a financial crisis. Neither district is burdened with a significant deficit. While detachment will result in loss of revenue, the loss will be made up or, at the least, offset by increased revenues. None of the evidence points to the inevitability of a momentous detrimental effect on either district's finances, or the corresponding programs and services offered by the districts, if detachment is allowed. This is not a case like *Richmond v. County Board of School Trustees of Whiteside County, Illinois, Lyndon Community High School District No. 307* (1968), 93 Ill. App. 2d 142, an authority cited by the plaintiffs, where the present and prospective operating expenses of the district losing territory exceeded its current revenue, and the district was thereby placed in jeopardy. The Regional Board's finding on this issue is not contrary to the manifest weight of the evidence.

The next factor regarding educational welfare concerns the relative distances of the pertinent schools from the students' homes. There is no dispute that younger students from the petitioning territory will be closer to the new elementary school under construction in District No. 200. Those students currently must ride a bus two or three miles to Pioneer School. While some of the students would still have to be bussed to the District No. 200 school, others would be able to walk. They would not, however, have to cross any thoroughfares comparable to Route 59. The respondent school districts' middle school and high school are closer to the petitioning territory than any District No. 200 facility, although students would be bussed in all districts.

In its order, the Regional Board made a finding only as to the greater accessibility of the District No. 200 elementary school, thus giving the proximity factor greater weight relative to elementary stu-

dents than to older students. In *Board of Education of Avoca School District No. 37 v. Regional Board of School Trustees* (1980), 82 Ill. App. 3d 1067, elementary school children in the petitioning territory had to travel by bus 2½ miles to the Avoca school, crossing dangerous, heavily traveled highways. These same children could walk to schools in the annexing districts, the average distance being 2½ blocks. At the same time, detachment would result in an increased distance to the junior high. The regional board had granted the petition for detachment. We agree with the *Avoca* court's comments on these facts:

"Though the increased distance [to the junior high] may be undesirable by some standard, it is difficult to view as a detriment to the community the Regional Board's election to have younger children traveling a shorter distance to and from elementary school and older children traveling the farther distance to junior high school." (*Avoca*, 82 Ill. App. 3d at 1074.)

In our view, the Regional Board properly gave greater weight to the fact that elementary age students would be closer to school in District No. 200.

The remaining factors recited in *Carver* reflect concern for the whole child and the related concept of community of interest. The first of these concepts recognizes that participation in social, religious, and commercial activities is a beneficial supplement to the child's involvement at school. (*Golf*, 89 Ill. 2d at 397; *Davis v. Regional Board of School Trustees of Madison County, Worden Unit School District No. 16* (1987), 155 Ill. App. 3d 185, 191.) The latter concept pertains to whether the petitioning territory identifies with the school district to which it wishes to annex, as well as with the community in which the school district lies. *Carver*, 146 Ill. 2d at 356; *Davis*, 155 Ill. App. 3d at 191.

We note, initially, that the petition was executed by 190 of the 199 registered voters residing in the petitioning territory. This figure leaves no doubt that the petitioning parents would prefer to have their children in District No. 200 rather than Districts No. 33 and No. 94. Beyond their obvious preference, however, the petitioners presented substantial evidence that they identify with District No. 200 and the Warrenville community rather than the City of West Chicago and the respondent school districts.

Petitioners testified that their children participate in Girl Scouts and Boy Scouts, sports activities, and various community-sponsored programs in Warrenville; that they frequently use the Warrenville library; and that they are served by the Warrenville post office. They

presented resolutions from the City of Warrenville, Warrenville public library, and the Round Grove park district in support of detachment and annexation. Much of petitioners' day-to-day personal business is taken care of in Warrenville. When the detaching and annexing school districts are located in separate communities, a determination must be made regarding the natural gravitation of the petitioners to one or the other community. (*Phillips v. Special Hearing Board* (1986), 154 Ill. App. 3d 799, 805.) In *Rhinehart v. Board of Education of Bloomington School District No. 87* (1971), 132 Ill. App. 2d 1078, 1083, the court cited *Wheeler v. County Board of School Trustees of Whiteside County, Illinois, Jordan Community Consolidated School District No. 143* (1965), 62 Ill. App. 2d 467, noting particularly the *Wheeler* court's emphasis on the concept that physical proximity and natural identification with the community have a direct bearing on students' educational welfare.

Fox Hollow, including the petitioning territory, is geographically separated from the populated areas of West Chicago to the north, particularly by Fermilab property and the forest preserve. Petitioners testified they would not allow their children to visit their West Chicago schoolmates by themselves because they would have to travel north on Route 59, a four-lane State highway with a posted speed limit of 50 miles per hour. While there was testimony that some District No. 200 students also live east of Route 59, it is not clear where those students attend school. In any event, if detachment is granted, the younger students would attend a nearby school which also serves the other children in their neighborhood. They would be closer to their fellow students and could interact with them without fear for their safety.

Physically, Fox Hollow enjoys considerably easier access to areas of Warrenville to the south than it does to West Chicago. Although one resident of the petitioning territory, testifying against detachment, indicated that her family did not feel isolated from West Chicago, she was planning to move out of Fox Hollow into West Chicago due to a pending divorce. Even this witness testified that she drove her children when they needed to cross or travel on Route 59. She also agreed that Fox Hollow was physically isolated from Districts No. 33 and No. 94.

The petitioners' physical proximity to and strong identification with the Warrenville community and District No. 200 should reasonably result in greater participation by both parents and children in school activities. Most particularly, it will be easier for elementary school pupils to get involved at a school located closer to their homes.

While the junior high and high school students would be bussed, and thus would face similar problems with school activities in either district, it seems more likely they would be motivated to participate at a school their parents favor and actively support. It is even more likely this would be true if the parents themselves became active in the school, and it is far more likely parents will participate at the schools which serve and are an integral part of the community with which the parents most closely identify. In this case, detachment and annexation are likely to trigger significant participation in school affairs by both children and parents.

■ The picture that emerges from the entire body of evidence presented to the Regional Board is that, as the Board found, the opposing school districts offer equally fine educational programs. This factor, therefore, was entitled to little weight in the Board's detachment decision. While the respondent school districts would lose some revenue, it would not be enough to affect seriously the quality of the education they provide. Too, because of the location of the petitioning territory, we can perceive no detrimental effect on the West Chicago community which, in large part, generates the students who attend Districts No. 33 and No. 94. On the other hand, proximity to the new District No. 200 elementary school and the current involvement of the petitioning area children and parents in the Warrenville community indicate that the overall education of the children would benefit by annexation to District No. 200. Absent substantial detriment to either school district, some benefit to the educational welfare of the students in the petitioning territory is sufficient to justify the granting of a petition for detachment and annexation. *Carver*, 146 Ill. 2d at 358; *Board of Education of Jonesboro Community Consolidated School District No. 43 v. Regional Board of School Trustees* (1980), 86 Ill. App. 3d 230, 233.

The Regional Board's conclusion that the overall benefit to District No. 200 and the petitioning territory outweighs any detriment to Districts No. 33 and No. 94, as well as the surrounding community as a whole, is not contrary to the manifest weight of the evidence. When the evidence supports the regional school board's decision, it is the duty of this court to affirm that decision. *Board of Education of Lovington Community Unit School District No. 303 v. Maycroft* (1980), 86 Ill. App. 3d 1130, 1133.

■ The final matter we must consider is the separate appeal filed by the Regional Board. The Board appeals from the trial court's order barring it from participation in the administrative review proceedings. The lower court essentially found that the Board lacked standing. The

Board now seeks to have the lower court's order vacated and prays that it be allowed to participate in trial court proceedings in the event of a remand. Plaintiffs respond by asking not only that the trial court be affirmed but also that the Board be barred from being an advocate in this appeal and that its appellate brief be stricken. We find that we need not resolve these issues.

With regard to the Board's standing to participate in the administrative review proceedings, we have already determined that the trial court's judgment must be reversed and the Board's decision affirmed. It follows that the matter will not be remanded. Consequently, we consider the issue moot.

Similarly, resolution of the question whether the Board had standing to prosecute an appeal is not necessary to our disposition of this matter. The trial court reversed the order granting detachment and annexation on the ground that the Regional Board's decision was contrary to the manifest weight of the evidence. The petitioners, who clearly did have standing, fully and completely addressed all facets of the manifest weight argument in their appeal. Likewise, petitioners responded in their reply brief to the issues raised by plaintiffs in their cross-appeal. Hence, the substantive issues would have been resolved with or without the Board's participation. Under the circumstances of this case it is immaterial whether the Board had standing to prosecute an appeal. Determination of this particular question is not necessary in order to dispose of the case before us. Nor would its determination have any effect on the outcome of the case. Accordingly, we decline to resolve the matter of the Board's standing.

In accord with the reasons set forth above, the order of the circuit court of Du Page County is reversed, and the order of the Regional Board of Trustees granting the petition for detachment is affirmed.

Trial court reversed; Regional Board affirmed.

McLAREN and GEIGER, JJ., concur.