BOARD OF EDUCATION OF ST. CHARLES COMMUNITY UNIT SCHOOL DISTRICT No. 303 *et al.*, Plaintiffs-Appellants, v. REGIONAL BOARD OF SCHOOL TRUSTEES OF THE KANE COUNTY EDUCATIONAL SERVICE REGION *et al.*, Defendants-Appellees.

Second District   No. 2—93—0892

Opinion filed April 27, 1994.

Michael J. Duggan and Ramona Pustelnikas Tanabe, both of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellant Board of Education of St. Charles Community Unit School District No. 303.

Fay Hartog-Rapp and Patricia J. Whitten, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellant Board of Education of Elgin School District U-46.

Stuart L. Whitt, of Law Offices of Stuart L. Whitt, of Aurora, and Solano & Burns, Ltd., of Wheaton, for appellees.

JUSTICE DOYLE delivered the opinion of the court:

Plaintiffs, the Board of Education of St. Charles Community Unit

School District No. 303 (District 303) and the Board of Education of Elgin School District U-46 (District U-46), filed a complaint for administrative review in the circuit court of Kane County, which sought judicial review of an administrative order entered by the Regional Board of School Trustees for the Kane County Educational Service Region (Regional Board) detaching certain property (Royal Fox) from District U-46 and annexing that property to District 303. At the time of filing the complaint, defendants, by and through the Committee of Ten, moved the Regional Board to enter an amended order, which sought to correct certain technical errors in the original order. Subsequent to the Regional Board's entry of the amended order, the circuit court granted plaintiffs leave to file their supplemental complaint for review. Following its review of the order and amended order, the circuit court affirmed the detachment/annexation decision of the Regional Board.

In their timely appeal from the circuit court's order, plaintiffs challenge the Regional Board's decision as being against the manifest weight of the evidence because defendants presented no evidence demonstrating an educational benefit to students residing in the proposed detachment area or the school districts involved. Additionally, because both plaintiffs demonstrated substantial detriment, it was error to grant the boundary change.

The subject territory is a 300-plus-acre tract of land comprised largely of the Royal Fox Subdivision (Royal Fox). Although Royal Fox is located entirely within the limits of the City of St. Charles (City), it is situated partially in District U-46 and partially in District 303.

As of January 1991, District 303 covered an area of 57 square miles and served 7,900 students. Approximately one-half of the student population came from St. Charles with the other half from outside the City. It was undisputed that District 303 was experiencing continued growth and that at the time of the hearing District 303 schools were at or near capacity.

District U-46 is the second largest school district in the State of Illinois. At the time of the hearing, it took in parts of 10 communities, and its student population was nearly 29,000, with continuing growth projected.

On July 1, 1992, a petition was filed in the Office of the Superintendent of the Educational Service Region, Kane County, Illinois, addressed to the Regional Board, seeking to detach the subject territory from District U-46 and to annex that territory to District 303. Over the next several months, hearings before the Regional

Board were held, and each side presented substantial testimony and documentary exhibits.

In their case in chief, petitioners presented 13 witnesses. Ten of the witnesses were residents of Royal Fox, two were experts, and the remaining witness was one of the developers. The 10 resident witnesses can be roughly categorized into three groups: (1) those with no children residing with them; (2) those with preschool-age children; and (3) those with school-age children. At the time of the hearing, there were only five school-age children among the 10 resident witnesses, and all of those children were attending private schools in St. Charles. Ultimately, the evidence established that two additional school-age children moved to Royal Fox during the pendency of the petition. These children apparently attended public school in District U-46. Additionally, it was undisputed that if all the lots in Royal Fox were fully developed, the proposed detachment/annexation could ultimately add approximately 100 students. The two experts testified on psychological and financial aspects, respectively, and the developer provided some background information.

The first group of resident witnesses testified as follows. Joyce Finger testified primarily about her own son's experience as a child attending a different school. She testified further about her affiliation with the community of St. Charles, and she opined that it would be better for children in the detachment area to attend school in St. Charles.

Diane Wollney testified that she had no children attending the schools in question and that she shopped, purchased clothing, and sought medical care in St. Charles. Additionally, she participated in St. Charles-affiliated recreational activities. In her capacity as a substitute school teacher, Wollney opined that it would be in the best interests of the children to attend school in their natural community.

Vivian Chang testified that she resided with her husband and that her 21-year-old daughter lived with them during her college vacation periods. Chang's testimony essentially related her daughter's experience with changing schools at a young age when the Chang's resided in Naperville. Chang further testified about her preference for shopping in St. Charles, and she opined that it would be better for the subject property to be annexed into St. Charles.

Lisa Will testified that she shopped for groceries and medical products in St. Charles and that she utilized the St. Charles park district. Will further stated that she was planning on having children and that she intended to continue working afterwards. Therefore, it was important to her that she had people in the neighborhood she could depend on. Will stated that she was not aware that her house was in District U-46.

In the second group of resident witnesses, those with preschool-age children, petitioners offered the testimony of Gina Cumerow and Alice Nadin. Gina Cumerow testified that she had two preschool children, ages $4^1/_2$ years and 1 month. Her son, the $4^1/_2$-year-old, attended church in St. Charles, went to the St. Charles library, attended St. Charles park district classes, and participated in park district activities. Cumerow further testified that she purchased groceries, pharmaceuticals, clothing, and furniture in St. Charles and that she had no affiliation with Elgin. Her son's friends in the neighborhood resided in the St. Charles school district, and he attended preschool and participated in park district activities with children who resided in the St. Charles school district. If the subject property were not annexed, Cumerow stated that her son would attend parochial school. She admitted on cross-examination, however, that when she moved into the community she was aware that her home was located in the Elgin school district.

Alice Nadin testified that she lived in Royal Fox with her husband and two children, ages $4^1/_2$ and 2 years. Her daughter attended a church-affiliated nursery school in St. Charles. Nadin further testified that she sought medical and dental treatment for her children in St. Charles and that she purchased groceries and other personal items in St. Charles. Nadin attended church in St. Charles, and her daughter attended Sunday school at that church. She and her family participated in St. Charles park district programs. On cross-examination, Nadin admitted that she was aware when she purchased her home that it was located in the Elgin school district.

In the third group of resident witnesses, those with school-age children, petitioners presented four witnesses. Carol Gross testified that she and her husband had two children, ages eight and five years. Both children attended parochial school in St. Charles. Her son, the eight-year-old, began attending parochial school after he attended the first grade at the Wayne Elementary School, a District U-46 school. Gross testified that she wanted her son to attend school in St. Charles because she felt his natural environment was in St. Charles. She further explained that she removed her son from Wayne because most of the children were from Bartlett and Carol Stream and there was no one from St. Charles. Accordingly, it was difficult for her son to acquire playmates and to have them over after school. At the time, to her knowledge, Gross' son was the only child in Royal Fox who attended Wayne.

Gross further testified that her son did not participate in any park district activities with his Wayne classmates because they belonged primarily to the Bartlett park district. The Gross family

belonged to the St. Charles park district. Additionally, her son attended classes at the St. Charles park district, and he did not participate in after-school activities with his "school friends."

Gross stated that shopping, religious, and social activities took place in St. Charles. Her daughter took ballet at the park district and one class the previous year at the St. Charles library; her son played in the St. Charles little league.

Gross further testified that since attending parochial school in St. Charles, she and her son were brought closer to the community of St. Charles and her son was happier and more fulfilled. Three of her son's friends in Royal Fox attended school in the St. Charles school district.

On cross-examination, Gross admitted that she was aware of the school crowding problems in District 303 and testified further that she was aware when she moved to Royal Fox that her home was located in District U-46 and that she was very pleased with the Wayne elementary school. In his testimony, James Gross, Carol Gross' husband, essentially corroborated Carol's testimony.

Sarah Carroll testified that she and her husband had two children, ages 11 and 8 years. She purchased groceries and pharmaceuticals in St. Charles, and her family was affiliated with a church located in St. Charles. Her eight-year-old daughter participated in gymnastics at the park district, and her son played soccer in a St. Charles-based league. Carroll testified further that her daughter had an auditory learning disability which could not be adequately addressed at the Wayne Elementary School.

Linda Weber testified that she and her husband had a 13-year-old daughter. Weber shopped and sought medical treatment in St. Charles. Her daughter attended parochial school in St. Charles, participated in St. Charles park district activities, and activities associated with two St. Charles churches. Additionally, her daughter was a competitively ranked tennis player, and Weber wanted her daughter to attend St. Charles high school because of its high quality tennis program. Weber further stated that the majority of her daughter's friends from parochial school will attend St. Charles high school, and she reiterated that if the petition were granted, her daughter would attend St. Charles high school and not a parochial high school.

Petitioners' two expert witnesses testified, respectively, regarding psychological and financial aspects of the proposed annexation/detachment. Bernard G. Suran, a clinical psychologist concentrated in family and child clinical psychology, testified that he reviewed the transcripts of proceedings and questionnaires from 13 respondents

residing in the Royal Fox subdivision regarding their sense of community affiliation. Suran admitted on cross-examination that he did not prepare the questionnaire; rather, Mr. Whitt, one of petitioners' attorneys, prepared it. Suran stated, however, that the questionnaire was similar to one that he had previously developed.

In addition to reviewing the questionnaires, Suran visited Royal Fox, examined the properties, looked at a map, and reviewed a roster of children residing in the subject territory. Suran opined that the children residing in Royal Fox had a community of interest with the other children in St. Charles and within the St. Charles school district. The basis of his opinion was the physical proximity with the St. Charles community and psychological proximity with other nearby children.

Suran further opined that it was in the best interest of the Royal Fox children to attend St. Charles public schools. Suran explained that the basis for his opinion was rooted in the integrity of the children's psychological development and that they share a common experience with other children. Suran further stated that the children would experience a "fractionation" of that psychological development if they were separated from children with whom they would be attending school for the purpose of the rest of their recreational development.

Suran explained further that children require an organized point of view about who they are, which relates to their self-development, concept of self, and development of their self-esteem. Children who are unable to formulate an integrated experience of who their friends are, of how they participate with their friends, and that their friends are individuals with whom they share academic activities as well as other activities, become confused.

Suran further stated that extensive study revealed that between 30% to 50% of children throughout the course of their development in the preschool years through early high school years will experience some sort of "transient situational disorder." When a child is further exposed to the possibility of disjointed and divided psychological experiences, "the occasion of transient situational disturbances take on a very different perspective." Children that are exposed to that level of stress, Suran stated, are likely to develop more lasting kinds of psychological problems. Suran opined that the children residing in Royal Fox would have an increased risk of experiencing such phenomena. It was his belief that all of the children within Royal Fox identified with the City of St. Charles.

On cross-examination, Suran admitted that he did not interview any of the parties residing in Royal Fox or any of the children. Suran

acknowledged further that it would not be impossible for the Royal Fox children to achieve integrated psychological development even if they were to attend the Elgin schools.

Craig A. Schilling, the director of business affairs and financial services for Glenbrook High School District No. 225, testified that he prepared a financial impact statement relating to the subject territory. Based upon his review of various documents and financial data for fiscal year 1991-92, Schilling opined that from a strictly financial perspective, detachment of the subject territory from District U-46 would result in no significant adverse financial impact, that Elgin's ability to meet the minimum standards prescribed by the State superintendent of schools would not be compromised, and that Elgin's ability to maintain its educational facilities and programs would not be affected. Additionally, District 303 would not experience any significant adverse economic impact, its ability to meet the State minimum standards would not be affected, and there would be no adverse impact on District 303's ability to maintain its educational facilities and programs.

Schilling derived his opinions from the results of a financial impact study that he conducted. In his summary of findings, Schilling determined, in part, that (1) District 303 could receive five additional students; (2) that it would gain $5,397,157 in equalized assessed valuation; (3) that it would gain $209,021 in property tax revenues for operating funds; and (4) it would lose $38,067 in general State aid. District U-46, on the other hand, (1) would not lose any students; (2) would lose $5,397,157, or .4%, of its equalized assessed valuation; (3) would gain $48,875 in general State aid; and (4) would have a net revenue loss of less than .2%, or $202,352, in all funds when compared to budgeted 1991-92 revenues of $139,259,072.

Respondents presented two witnesses in their case in chief. Gordon Schultz, the assistant superintendent for finance, secretary and treasurer for District U-46, testified that he was familiar with a 1992 comprehensive report prepared by the citizens advisory committee to the board of education. Schultz testified that the Wayne elementary school, at the time of the hearing, was under capacity because the attendance boundaries for another school had been moved, thus necessitating fewer class sessions. Schultz acknowledged that there were plans to restructure the attendance boundaries of the middle schools in the district and plans to build a new high school. Schultz acknowledged on cross-examination that Royal Fox was not listed in the comprehensive report.

Based upon his review of various financial-related documents, Schultz computed that the increased value for the subdivision if fully

built out, and assuming 1991 values, would be $20,750,000 in equalized assessed valuation. Schultz further calculated revenues to be generated from the subject territory. For the current year, he calculated the amount at $273,927. At the "built-out" value, he computed an amount of $852,777.

Although not entirely clear from his testimony, Schultz established that District U-46 had been operating with fluctuating deficits since 1987-88. Schultz further acknowledged that the operating deficit for 1992-93 was projected at $2 million and the previous year's deficit was $8 million. The accumulated operating deficit was projected at $14,500,000 by July 1, 1993. Based upon the accumulated deficit and the current operating deficit, Schultz stated that the loss of anywhere from $200,000 to $900,000 was significant. Because of such a serious loss, the Board of Education determined to oppose the detachment petition.

On cross-examination, Schultz acknowledged that according to records for 1991, which were used in Schilling's financial impact study, the equalized assessed valuation of the subject property was equal to four-tenths of 1% of the equalized assessed valuation for the entire District U-46. Schultz further acknowledged that the Elgin school district had experienced growth in its equalized assessed valuation of varying percentages since 1987 and that the growth in the district did not rely entirely on a single piece of property.

Schultz further acknowledged that the district was in deficit financing and that during the past several years the district had issued working cash fund bonds to assist with financing. Schultz believed that by the end of the year the school district would have a working cash fund of $27 million. He further acknowledged that the school district had the ability to abolish the fund and transfer the $27 million from that fund to another, provided it was in accordance with the law. On redirect examination, however, Schultz explained that in the absence of a referendum the fund could only be recreated to the extent necessary to collect a five-cent tax levy, which would generate about $800,000 per year. The working cash fund also generated interest each year, and Schultz acknowledged that on June 30, 1991, he was able to transfer $1.49 million to other funds.

Susan Vogus, president of the District 303 Board of Education (Board), testified that the biggest issue facing District 303 was growth. It was undisputed that the District 303 schools were at or near capacity. As part of the Board's strategic planning process, a demographic study was conducted and an advisory commission appointed.

In January 1991, the results of the demographic study were pre-

sented to the Board. Contained in the study were three sets of projections labeled series A, B, and C. Generally, each series represented differing rates of growth as the basis for its projection. The Board chose series B, which represented "middle of the road" growth, as its guide for preparing future plans. Vogus stated that the series B projections were remarkably close to actual enrollment over the previous two years. Also included in the appendix section of the study was a list of approved and concept developments in the District 303, which listed Royal Fox as one of the developments.

Vogus testified further that she anticipated the Board redrawing the attendance lines for District 303. Additionally, the Board had come to the consensus that it did not want to overbuild in the district and that all the proposals it was studying did not assume the addition of territory to District 303. Vogus stated that the addition of 100 students to District 303 would be harmful. Vogus admitted, however, that the District 303 student population fluctuated from week to week, and when additional students appeared they were accommodated.

On December 10, 1992, the Regional Board entered its order granting the detachment/annexation petition. In its order, the Regional Board found, among other things, (1) that the residents of Royal Fox and their children's activities were centered in St. Charles; (2) that the addition of 7 students, with a potential of between 50 and 100 students to be added over the next several years, would not have a significant effect on the enrollment in District 303; and (3) that District U-46 would lose some revenue but not a sufficient amount to destabilize finances in light of the fact that District U-46 had a working cash fund of $27 million. Following the entry of an amended order to correct technical deficiencies in the original order, respondents filed a complaint in the circuit court seeking judicial review of the order and amended order.

The circuit court affirmed the Regional Board's orders. Specifically, the court determined, among other things, that the evidence was unrefuted that granting of the petition would result in a *de minimis* loss in net revenue to District U-46 and a concomitant gain to District 303. Additionally, granting the petition would add only five students to District 303, no two of which were in the same grade level. The evidence further established that the City of St. Charles was the petitioners' natural community and that they had no relationship with the City of Elgin or District U-46. The court further found that the Regional Board considered each of the factors enumerated in accordance with the benefit/detriment test enunciated in *Carver v. Bond/Fayette/Effingham Regional Board of School*

*Trustees* (1992), 146 Ill. 2d 347. Respondents (plaintiffs) appeal from the order of the circuit court.

On appeal, plaintiffs contend that the Regional Board's findings were against the manifest weight of the evidence because petitioners failed to present any evidence on the question of educational benefit to the children. Plaintiffs contend further that the Regional Board should have denied the petition because both school districts demonstrated substantial detriment. We disagree with both contentions and therefore affirm the order of the circuit court upholding the decision of the Regional Board.

■ In reviewing the orders of the Regional Board, this court's scope of review extends to all questions of law and fact presented by the record, but the factual findings of the administrative agency are held to be *prima facie* true and correct. (See 735 ILCS 5/3—110 (West 1992); *Carver,* 146 Ill. 2d at 355.) It is the role of the regional board, not a reviewing court, to make findings of fact and to weigh the relevant factors, and the board's determinations and decisions will not be rejected on administrative review unless they are contrary to the manifest weight of the evidence. (*Board of Education of Golf School District No. 67 v. Regional Board of School Trustees* (1982), 89 Ill. 2d 392, 396; *Board of Education of Community High School District No. 94 v. Regional Board of School Trustees* (1992), 242 Ill. App. 3d 229, 235.) Accordingly, this court will not reweigh the evidence or substitute its judgment for that of the regional board. (*District No. 94,* 242 Ill. App. 3d at 235.) This court remains cognizant, however, of its duty to "examine the evidence in an impartial manner and to set aside an order which is unsupported in fact." *Carver,* 146 Ill. 2d at 355.

Section 7—6 of the School Code sets forth the standards to be considered by a regional board of school trustees in determining whether to allow detachment of certain territory from one district and annexation to another. (*District No. 94,* 242 Ill. App. 3d at 235.) Section 7—6 provides, in part, that the regional board:

"shall hear evidence as to the school needs and conditions of the territory in the area within and adjacent thereto and as to the ability of the districts affected to meet the standards of recognition as prescribed by the State Board of Education, and shall take into consideration the division of funds and assets which will result from the change of boundaries and shall determine whether it is in the best interests of the schools of the area and the educational welfare of the pupils that such change in boundaries be granted." 105 ILCS 5/7—6(i) (West 1992).

■ Under section 7—6, petitions for detachment and annexation

should be granted only where the overall benefit to the annexing district and the detachment area clearly outweighs the resulting detriment to the losing district and the surrounding community as a whole. (*Carver*, 146 Ill. 2d at 356.) In applying the benefit-detriment test, reviewing courts are to consider differences between school facilities and curricula, the distances from the petitioners' homes to the respective schools, the effect detachment would have on the ability of either district to meet State standards of recognition, and the impact of the proposed boundary change on the tax revenues of both districts. (*Carver*, 146 Ill. 2d at 356; *District No. 94*, 242 Ill. App. 3d at 235-36.) It was undisputed that Districts 303 and U-46 offered students comparable facilities and curricula and that neither district's ability to meet State standards of recognition would be impaired if the petition were granted. Additionally, both parties acknowledge that the distance between petitioners' homes and the respective schools was not at issue.

In addition to the factors enumerated above, courts may consider the "whole child" and "community of interest" factors. (*Carver*, 146 Ill. 2d at 356.) These factors explore the identification of the petitioning territory with the district to which annexation is sought, and the corresponding likelihood of participation in school and extracurricular activities. (*Carver*, 146 Ill. 2d at 356; *Golf*, 89 Ill. 2d at 397-98.) The whole child factor recognizes that extracurricular participation in social, religious, and even commercial activities are important in a child's development as a beneficial supplement to academics. (*Golf*, 89 Ill. 2d at 397.) Moreover, it is not inappropriate to consider the personal preferences or convenience of the petitioning parents and their children; however, more than the personal preferences on the part of the petitioners is required to support a change in school district boundaries. *District No. 94*, 242 Ill. App. 3d at 236.

Furthermore, where an absence of substantial detriment to either school district is present, some benefit to the educational welfare of the students in the detachment area must nevertheless be shown in order to justify the grant of a petition for detachment and annexation. (*Carver*, 146 Ill. 2d at 358.) Accordingly, we will consider first whether there is sufficient evidence in the record to support the conclusion that neither District 303 nor District U-46 would experience a substantial detriment if the petition were granted. In its order, the Regional Board found (1) that the addition of 7 students, with the potential for an additional 50 to 100, from the subject territory would not have a significant effect on the enrollment of District 303; and (2) that although District U-46 would lose revenue, it would not be an amount sufficient to destabilize its finances "in

light of the fact" that District U-46 had a working cash fund of $27 million.

Plaintiffs maintain that the Regional Board's findings were against the manifest weight of the evidence for two reasons. First, with respect to District 303, plaintiffs argue that Vogus' testimony regarding, among other things, school crowding, the series B demographic study, and another report which indicated the potential for an additional 100 students demonstrated that District 303 would be significantly affected. Second, with respect to District U-46, plaintiffs argue that it was error for the Regional Board to compare the working cash fund with District U-46's ongoing operating and accumulated budget deficits. Related to this second point, plaintiffs maintain further that the circuit court's " 'finding' of a *de minimis* financial impact was contrary to the weight of the evidence."

■ Following a review of the record before us, we find ample support for the Regional Board's findings of fact on the question of substantial detriment to either school district. Relating to District 303, the Regional Board's order clearly considered the impact on the district of not only the 7 existing school age children, but specifically found that an additional 50 to 100 students would not be of significant effect. It was undisputed that District 303 was growing and that crowding was a "front burner" issue. We note parenthetically that plaintiffs' counsel conceded in the circuit court that there were no facts in the record to support a need to serve 100 children and that the "potential" existed only if Royal Fox were fully built out. The testimony further revealed that District 303 dedicated considerable effort and resources toward planning for continued growth. Considering this testimony, and the fact that Royal Fox was included in the demographic study commissioned by District 303, we determine that the Regional Board could have reasonably concluded that any increased enrollment, which would result from annexation of the subject territory, would be accounted for and accommodated in District 303's growth plans. Additionally, Vogus' admission on cross-examination that the school population fluctuated on a week-to-week basis and that additional students are accommodated further supports the conclusion of no substantial detriment to District 303. We further find Vogus' expressed apprehension that this case would set a precedent for future annexation/detachment petitions unfounded because each case is decided on the facts and record as presented. See *Wheeler v. County Board of School Trustees of Whiteside County, Illinois, Jordan Community Consolidated School District No. 143* (1965), 62 Ill. App. 2d 467, 476.

Turning to District U-46, we find ample evidence in the record to

support the Regional Board's finding that District U-46 would experience no substantial detrimental effect. Petitioners' financial expert opined that detachment of the subject territory from District U-46 would not result in any significant adverse financial impact. His opinion was based on a financial impact study he prepared from various sources of data. Plaintiffs did not dispute the findings in the financial impact study, and their own expert acknowledged the efficacy of those findings. The study found that District U-46 would lose only four-tenths of 1% in equalized assessed valuation and a net revenue loss of less than .2%, or $202,352, when compared to budgeted 1991-92 revenues. A reduction in equalized assessed valuation of such magnitude is *de minimis* and insufficient to conclude that the losing district would suffer a substantial financial detriment. See *Bowman v. County Board of School Trustees* (1974), 16 Ill. App. 3d 1082, 1086; see also *Davis v. Regional Board of School Trustees of Madison County, Worden Unit School District No. 16* (1987), 155 Ill. App. 3d 185, 188-89; *School District 106 v. County Board of School Trustees* (1964), 48 Ill. App. 2d 158, 165.

Although the record established that District U-46 was in deficit financing, we are unpersuaded, in the absence of evidence supporting a clearly opposite conclusion, that the mere existence of deficit financing is a sufficient ground on which to deny a petition for detachment. Financial loss to the detaching district is a relevant consideration; however, the resulting depletion of tax revenues must be serious. *Carver*, 146 Ill. 2d at 357.

In the present case, there is insufficient evidence on the record to support the clearly opposite conclusion that the resulting loss in tax revenues to District U-46 would be serious. Petitioners' expert's study established the net revenue loss to District U-46 would be less than two-tenths of 1%, or $202,352, in all funds when compared to budgeted revenues of $139,259,072. Plaintiffs' financial expert acknowledged further that District U-46 had experienced sustained growth in its equalized assessed valuation, although of varying percentages, since 1987 and that the growth in the district did not rely entirely on a single piece of property. The loss of revenue from detachment will be compensated by a corresponding increase in revenues resulting from District U-46's increasing growth in equalized assessed valuation. Plaintiff's expert further acknowledged that District U-46 had the ability to abolish its $27 million working cash fund and transfer the money to certain legally permissible funds. Additionally, the working cash fund itself generated interest.

Plaintiffs claim, however, that it was "clear error" for the Regional Board to compare the working cash fund with District

U-46's ongoing operating and accumulated budget deficits "when the deficits were raised as evidence that further reductions in the District's tax revenues would create a significant financial detriment to the District." We find no support in the record for this assertion. In their brief plaintiffs acknowledge that the only finding in the Regional Board's report relating to District U-46's financial condition was that the loss of revenue would not destabilize its finances "in light of the fact that [District U-46] has a working cash fund of $27 million." Although the Regional Board obviously found the existence of the working cash fund relevant in reaching its finding, it would be impossible to ascertain from the record before us, and thus determine the existence of error, what comparisons and analysis the Regional Board applied in reaching its finding. Accordingly, we find this unsupported contention without merit.

Having concluded that the Regional Board's findings that neither school district would suffer substantial detriment if the petition were granted are supported by evidence in the record (see *Fixmer v. Regional Board of School Trustees* (1986), 146 Ill. App. 3d 660, 664), we must consider whether there is some evidence in the record to support a finding of educational benefit to the children affected. (*Carver*, 146 Ill. 2d at 358.) It was undisputed that both school districts offered curricula and facilities of comparable quality. Plaintiffs maintain, however, that petitioners fatally failed to present any evidence of educational welfare. We disagree.

In *Carver*, our supreme court explicitly recognized that the inquiry into educational welfare was not to be confined narrowly to the comparative advantages and disadvantages of competing curricula and facilities. (*Carver*, 146 Ill. 2d at 359-61.) Although plaintiffs do not dispute this principle, their argument appears to ignore the court's pronouncement that educational welfare has been "broadly interpreted" (*Carver*, 146 Ill. 2d at 359). Moreover, their argument implicitly suggests that it would be unreasonable for the Regional Board to infer an educational benefit in the absence of some direct tangible evidence of the same. Such an assertion, in our opinion, contravenes the supreme court's explicit recognition that when the educational programs of the respective districts are equivalent, other considerations may prove dispositive. (*Carver*, 146 Ill. 2d at 359.) Moreover, although personal preferences alone are insufficient to support a school boundary change, the petitioning parents' preference is a relevant consideration. (*Carver*, 146 Ill. 2d at 356; *Golf*, 89 Ill. 2d at 400.) With the foregoing in mind, we turn to consider the evidence adduced before the Regional Board.

If we were to view the testimony of the first group of resident

witnesses in isolation, we would agree with plaintiffs that petitioners presented evidence of no more than personal preferences related to shopping, professional services, religious activities, and recreation, which would not support an annexation/detachment petition. (See *Carver*, 146 Ill. 2d at 358; *Oakdale Community Consolidated School District No. 1 v. County Board of School Trustees* (1957), 12 Ill. 2d 190, 193-94.) Additionally, their collective testimony and opinions that it would be in the children's best interests to attend St. Charles schools lends no factual support for a boundary change " 'with an eye to the educational welfare of the children residing in all the territory to be affected.' " *Carver*, 146 Ill. 2d at 358, quoting *Oakdale*, 12 Ill. 2d at 193-94.

After considering the testimony of the remaining residents, however, we disagree with plaintiffs that there is no evidence in the record to support the conclusion that the affected children would receive an educational benefit. Where educational curricula and facilities of competing districts are in balance, courts have considered a student's identification with his or her "natural community center" and the corresponding increase in participation in school and extracurricular activities. (*Carver*, 146 Ill. 2d at 359-60; see also *Board of Education of Jonesboro Community Consolidated School District No. 43 v. Regional Board of School Trustees* (1980), 86 Ill. App. 3d 230, 233-34.) Physical proximity and natural identification with the community have obvious advantages to a student's educational welfare. *Wheeler*, 62 Ill. App. 2d at 477.

■ The testimony of the remaining resident witnesses supports the conclusion that the educational welfare of the affected children would be enhanced if the petition were granted. Their collective testimony established that all of their children participated in religious and recreational activities in St. Charles. There was nothing in the record to suggest that any of the children participated in similar activities in Elgin, or those communities associated with District U-46. Additionally, Carol Gross testified that her son did not participate in any park district activities with his Wayne school classmates and that she removed her son from the Wayne school because there were no children from St. Charles. Sarah Carroll testified that her daughter's auditory learning disability could not be properly addressed at the Wayne Elementary School, and Linda Weber testified that St. Charles high school offered her daughter, a competitively ranked tennis player, a superior athletic program. (*Cf. Board of Education, Community High School District No. 154 v. Regional Board of School Trustees* (1980), 84 Ill. App. 3d 501, 505.) Accordingly, the record supports the conclusion that the affected

children's educational welfare would be enhanced if the detachment/ annexation petition were granted.

Additionally, the court heard testimony from the petitioning parents about their preferences for associating themselves with the City of St. Charles. Although this testimony standing alone would be an insufficient ground on which to grant the petition, the Regional Board could properly consider such testimony. *Steichen v. Lemon* (1990), 192 Ill. App. 3d 714, 723.

Furthermore, we find the cases relied on by plaintiffs, *Board of Education of Carrier Mills-Stonefort Community Unit School District No. 2 v. Regional Board of School Trustees* (1987), 160 Ill. App. 3d 59, *District No. 94*, 242 Ill. App. 3d 229, and *Dresner v. Regional Board of School Trustees* (1986), 150 Ill. App. 3d 765, distinguishable from the present case. Unlike the present case, *Carrier Mills* involved a one-acre parcel of land and a single petitioning family, whose testimony established no more than their personal preferences. The court further noted that the petitioners' personal preference could only be accommodated at the expense of the relatively smaller school district.

In *District No. 94*, wherein this court reversed the circuit court and affirmed a regional board's decision to grant a change in school boundaries, the record was found to support the conclusion that the competing school districts had equivalent quality educational programs and that no substantial financial detriment to either district was present. Although we noted in that case that "school crowding militated in favor of the change," there is nothing contained within our opinion to indicate, with the quality of the educational programs equal and no substantial detriment to either district, that school crowding was the sole basis in the record supporting the regional board's decision to grant the petition. Moreover, similar to the present case, we specifically considered the educational welfare of children affected in light of the whole child and community of interest factors. Accordingly, the reasoning and result in *District No. 94* do not dictate reversal of the present case.

In *Dresner*, this court affirmed the dismissal of a detachment petition on the grounds that the decision of two regional boards and an order of the circuit court were not against the manifest weight of the evidence. (*Dresner*, 150 Ill. App. 3d at 779.) In affirming, we noted, among other things, that both districts were unit school districts; that the testimony of the parents centered on where their social community was located while only touching on the children's social community; that there was testimony indicating that the children's friends were more than one mile away and not within walking distance; and that there was no testimony indicating that the chil-

dren were prohibited from participating in extracurricular activities because of the location of their homes or that the children had some exceptional talent which would be nurtured by the annexing district.

Unlike *Dresner*, the testimony in the present case established that at least two of the children had neighborhood friends who lived in the St. Charles district. Additionally, there was testimony about one child, a competitively ranked tennis player, whose athletic talents would be better served in District 303. There was also some suggestion that another child with an auditory learning disability might also be better served in District 303. Furthermore, there was testimony from one witness about the difficulty her son had participating in after school activities because his classmates at Wayne Elementary School, when he attended there, belonged to a different park district. Accordingly, we find plaintiffs relied upon cases factually distinguishable from the present case.

Finally, because the resident witnesses' testimony amply supported the conclusion that the affected children would receive an educational benefit if the petition were granted, it is unnecessary to consider any issue raised by plaintiffs regarding the admissibility of petitioners' psychological expert. It is incumbent on this court, therefore, to affirm the circuit court's decision because, based upon our review of the entire record, we find that the evidence supports the Regional Board's order and amended order. See *District No. 94*, 242 Ill. App. 3d at 244.

The judgment of the circuit court is affirmed.

Affirmed.

INGLIS, P.J., and BOWMAN, J., concur.