# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Board of Education of Du Page High School District 88 v. Pollastrini,**
**2013 IL App (2d) 120460**

---

| | |
|---|---|
| Appellate Court Caption | THE BOARD OF EDUCATION OF Du PAGE HIGH SCHOOL DISTRICT 88 and THE BOARD OF EDUCATION OF SALT CREEK SCHOOL DISTRICT 48, Plaintiffs-Appellees, v. LAURA POLLASTRINI, in her official capacity; TIMOTHY WHELAN, in his official capacity; JAMES SHEHEE, in his official capacity; GENE CAMPBELL, in his official capacity; JOSEPH WOZNIAK, in his official capacity; MARTHA J. RODGERS, in her official capacity; GLORIA SCIGOUSKY, in her official capacity; THE Du PAGE COUNTY REGIONAL BOARD OF SCHOOL TRUSTEES; NANCY BARNHARDT, SHELLY BLEDSOE, STEVEN BOUCHER, JOHN GEAREN, BENJAMIN KLOSTERMAN, ELLIOT LEWIS, KEITH LOPATKA, KATHLEEN OCZAK, ANN SCOTT, and BRETT SIMONS, Collectively Known as the Committee of Ten; THE BOARD OF EDUCATION OF BUTLER SCHOOL DISTRICT 53; and THE BOARD OF EDUCATION OF HINSDALE TOWNSHIP HIGH SCHOOL DISTRICT 86, Defendants-Appellants. |
| District & No. | Second District Docket No. 2-12-0460 |
| Filed | August 29, 2013 |
| Held (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A trial court's reversal of plaintiff school boards' orders granting defendants' petition to detach their subdivision from plaintiff districts and annex the subdivision to two other districts was affirmed, since defendants failed to file the requisite number of signatures substantially complying with the statutory mandate that the signers' signatures match the signatures on the voters' registration cards. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Du Page County, Nos. 11-MR-152, 11-MR-897; the Hon. Bonnie M. Wheaton, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | J. Timothy Eaton and Patricia S. Spratt, both of Shefsky & Froelich, Ltd., of Chicago, and Christopher J. Stull, of Law Office of Christopher J. Stull, P.C., of West Chicago, for appellants. |
| | William F. Gleason and Daniel M. Boyle, both of Sraga Hauser, LLC, of Flossmoor, for appellee Board of Education of Du Page High School District 88. |
| | Peter K. Wilson, Jr., of Mickey, Wilson, Weiler, Renzi & Andersson, P.C., of Aurora, for appellee Board of Education of Salt Creek School District 48. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. Justice Hutchinson specially concurred, with opinion. Justice Birkett specially concurred, with opinion. |

## OPINION

¶ 1    This case involves a detachment petition affecting the Timber Trails-Merry Lane Subdivision (Timber Trails) in Oak Brook. The subdivision is located directly south of Roosevelt Road and is bordered by the Yorkshire Woods to the east and the Oak Brook shopping center to the west. The subdivision has been sending children to Salt Creek School District 48 (District 48) and Willowbrook High School District 88 (District 88) for more than 30 years. On September 8, 2010, pursuant to the Illinois School Code (105 ILCS 5/1-1 *et seq.* (West 2010)), the petitioners, Nancy Barnhardt, Shelly Bledsoe, Steven Boucher, John Gearen, Benjamin Klosterman, Elliot Lewis, Keith Lopatka, Kathleen Oczak, Ann Scott, and Brett Simons, filed a petition with the Regional Board of School Trustees of Du Page County (the Board) for detachment. The petitioners sought to detach the Timber Trails area from Districts 48 and 88 and have the area annexed into Butler School District 53 (District 53) and Hinsdale Central High School District 86 (District 86). On June 3, 2011, the Board entered an order granting the petition for detachment. On April 6, 2012, the circuit court of Du Page County reversed the Board's order. The petitioners appeal from that order. We affirm.

¶ 2                                    BACKGROUND

¶ 3        On September 8, 2010, the petitioners filed the petition for detachment. In support of the petition, the petitioners attached 256 signatures. In response, Districts 48 and 88 (the Districts) filed a motion to dismiss, arguing that 97 of the signatures filed in support of the petition were not valid, because they did not match the official signatures on file with the Du Page County election authority. Because the petitioners had filed only 159 (256 minus 97) valid signatures, the Districts argued, the petitioners had not filed enough signatures to confer jurisdiction on the Board.

¶ 4        On January 10, 2011, the Board conducted a hearing on the motion to dismiss. The petitioners' attorney made an offer of proof that all of the people who circulated the petition would testify that all the people who had signed the petition were registered voters who resided in the petitioning territory and had given their valid signatures. Further, all the people who had circulated the petition had sworn and attested to a circulator's oath in the presence of a notary public. One of the Board members stated:

      "I don't understand why we don't trust the circulator, the circulator's signature for all of the names on the sheet. And so, just compare the circulators' signatures that the Notary Public has attested to."

In response, the Districts' attorneys argued that, under the applicable statute, it did not matter what the circulators would testify to; what mattered was whether the voters' purported signatures on the petition matched their official signatures with the Du Page County election authority. At the close of the hearing, the Board denied the motion to dismiss. The Board explained that it had "considered the challenged signatures and determined that there were enough valid signatures contained within the Petition to meet the jurisdictional requirements" of the School Code.

¶ 5        On June 3, 2011, the Board entered an order granting the petition for detachment. The Districts thereafter filed a timely complaint for administrative review in the circuit court of Du Page County. On April 6, 2012, the circuit court reversed the Board's order. The petitioners appeal from that order.


¶ 6                                      ANALYSIS

¶ 7        The Districts argue that 97 of the signatures on the petition did not match the verified voter registration signatures on file at the Du Page County Election Commission. If those 97 signatures are removed, only 159 remain, which is insufficient for the petition to proceed.

¶ 8        Section 7-1(a) of the School Code provides that two-thirds of the registered voters in any territory to be detached must sign the underlying petition. 105 ILCS 5/7-1(a) (West 2010). Each signature contained on the petition "shall match the official signature and address of the registered voters as recorded in the office of the election authority having jurisdiction over the county." *Id.* The number of signatures called for by the statute is a jurisdictional requirement for detachment. *Board of Education of Community High School District 94 v. Regional Board of School Trustees*, 242 Ill. App. 3d 229, 237-39 (1993).

¶ 9      According to the petition, there were 362 registered voters residing in the proposed detachment territory at the time the detachment petition was filed. Thus, in order to comply with section 7-1(a) of the School Code, the petition needed to be supported by the signatures of 242 registered voters.[1] The petition contained 256 signatures.

¶ 10      "The fundamental principle of statutory construction is to ascertain and give effect to the intention of the legislature by giving the language of the statute its plain and ordinary meaning." *Board of Education of Chenoa Community Unit School District No. 9 v. Regional Board of School Trustees*, 266 Ill. App. 3d 461, 465 (1994). "The sections of the School Code are *in pari materia*, and they must be construed with reference to one another in order to give harmonious meaning to the act as a whole." *Maiter v. Chicago Board of Education*, 82 Ill. 2d 373, 389 (1980).

¶ 11      The term "shall" typically indicates a mandatory rather than a directory provision. *Schultz v. Performance Lighting, Inc.*, 2013 IL App (2d) 120405, ¶ 13. A mandatory provision does not always require strict compliance and might be satisfied through substantial compliance. *Id.* Strict compliance will be required if the term "shall" is accompanied by some sort of penalty or consequence. *Id.* ¶ 14. Where the term is not accompanied by some sort of penalty or consequence, substantial compliance is sufficient. *Id.* Our courts have interpreted section 7-1 of the School Code to require only substantial compliance. See *Ambrose v. Thornton Township School Trustees*, 274 Ill. App. 3d 676, 684 (1995). The term "match" is defined as a "thing equal or similar to another." www.merriam-webster.com/dictionary/match (last visited Feb. 28, 2013).

¶ 12      The issue thus becomes whether the signatures on the petition substantially complied with the statutory mandate that they match the signatures on the voter registration cards. In finding that the signatures matched, the Board necessarily determined that there was substantial compliance.

¶ 13      In reviewing the Board's decision, the parties disagree as to the proper standard of review. The petitioners argue that the Board's finding as to the validity of the signatures is no different from any other finding that the Board makes; thus, its decision is entitled to deference and should be reversed only if against the manifest weight of the evidence. See *Board of Education of Marquardt School District No. 15 v. Regional Board of School Trustees*, 2012 IL App (2d) 110360, ¶ 20 (factual determinations by an administrative agency are held to be *prima facie* true and correct and will stand unless contrary to the manifest weight of the evidence). Relying on *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009), the Districts insist that the standard of review should be *de novo* because this court can review as well as the Board whether the signatures on the detachment petition match the signatures on the verified registration signature forms.

¶ 14      In *Fay*, at issue was what standard of review the court should employ in reviewing certain factual findings that the trial court had made. *Id.* at 451. The supreme court stated:

     "In this case, the trial court heard no live testimony. Both parties acknowledged at

---

[1]Two-thirds of 362 is 241.33. Thus, the petition needed to have at least 242 signatures to comply with the statute.

oral argument that all testimony was submitted by admitting discovery depositions into evidence. The trial court was not required to gauge the demeanor and credibility of witnesses. [Citation.] Instead, the trial court made factual findings based upon the exact record presented to both the appellate court and to this court. Without having heard live testimony, the trial court was in no superior position than any reviewing court to make findings, and so a more deferential standard of review is not warranted. Thus, although this court has not done so recently, we reiterate that where the evidence before a trial court consists of depositions, transcripts, or evidence otherwise documentary in nature, a reviewing court is not bound by the trial court's findings and may review the record *de novo*." *Id.* at 453.

Here, the Board's decision as to the validity of the signatures was not based on any live testimony but rather was based on the exact record that has been presented to this court. Thus, it is proper for this court to employ a *de novo* standard of review. See *id.*; see also *Ambrose*, 274 Ill. App. 3d at 681 (a reviewing court may evaluate *de novo* documentary evidence presented in an administrative proceeding).

¶ 15    In so ruling, we find the petitioners' reliance on *Hoxha v. LaSalle National Bank*, 365 Ill. App. 3d 80, 85 (2006), to be misplaced. In *Hoxha*, at issue was whether the decedent had signed a document that provided for the sale of certain property to the plaintiffs upon her death. The plaintiffs presented the testimony of a forensic document examiner who testified that the signature on the document was the decedent's. There was also evidence that, although the document had been notarized, the notary had backdated the document. Further, the executor of the decedent's estate testified that, although she had been the decedent's friend for over 25 years, she was not aware of the document until the plaintiffs sent it to her after the decedent's death. At the close of the trial, the trial court determined that the plaintiffs had failed to prove that the decedent had executed the document. The reviewing court affirmed, explaining that the trial court's determination that the signature at issue was not authentic was not against the manifest weight of the evidence in light of the suspicious circumstances of the case. *Id.* The reviewing court further stated that "[t]he trial court, as finder of fact, had the right to make its own handwriting sample comparisons when deciding whether the signature was authentic, expert opinion or not." *Id.* As "the trial court had more than comparisons; it had circumstances that led it to the conclusion [that the plaintiffs] were not worthy of belief," the reviewing court would not disturb its decision. *Id.* Thus, as live testimony was at issue in *Hoxha*, that case is not applicable to the case before us.[2]

¶ 16    We therefore turn to a consideration of the signatures that the petitioners submitted in support of their detachment petition. We note that there is a dearth of Illinois law on the subject of how such signatures should be analyzed. However, in considering existing Illinois law as well as foreign authorities, certain standards emerge. Substantial compliance will be

---

[2]We note that either party could have sought to have the people who purportedly signed the petitions testify that the signatures appearing on the petition were in fact (or were not in fact) their signatures. If there had been such testimony, we would necessarily defer to the Board's credibility determinations and employ a manifest-weight-of-the-evidence standard of review.

found if the signature transposes the first name and middle initial (*Board of Education of Wapella Community Unit School District No. 5 v. Regional Board of School Trustees*, 247 Ill. App. 3d 555, 560 (1993)), if the middle initial is omitted (*People ex rel. Owen v. Dunn*, 247 Ill. 410, 413 (1910)), if a suffix, such as Junior, is omitted (*Morton v. State Officers Electoral Board*, 311 Ill. App. 3d 982, 985 (2000)), or if a common shortened version of a first name (such as Ray) is used instead of the full first name (such as Raymond) (*Bonardo v. People*, 182 Ill. 411, 424 (1899); *In re Nomination Petition of Gales*, 54 A.3d 855, 859 (Pa. 2012)). Substantial compliance will not be found if one uses an initial for a first or last name. *In re Nomination Petition of Flaherty*, 770 A.2d 327, 332 (Pa. 2001). Similarly, if using an initial instead of a full first name is not substantial compliance, then omitting a first or last name completely is not substantial compliance. See *id.* Further, substantial compliance will not be found if the signature is printed rather than in cursive as it appears on the corresponding registration form. *State ex rel. Rogers v. Taft*, 594 N.E.2d 576, 579 (Ohio 1992).

¶ 17    Based on the above standards, the petitioners did not submit sufficient signatures to confer jurisdiction on the Board. Sixteen of the people signing the petition used initials for either their first names or both their first and last names instead of spelling out their first and last names as they did on their voter registration cards. Moreover, four of the signatures at issue, in contrast to the voter registration cards, did not give any first name at all. One of the people signing the petition wrote in cursive rather than printing as she did on her voter registration card. Thus, these 21 signatures must be subtracted from the 256 that the petitioners submitted, which means that the petitioners submitted only 235 valid signatures. As this was less than the statutory minimum (242) to confer jurisdiction on the Board, we need not consider the other signatures that the Districts complain of on appeal. Accordingly, the circuit court properly reversed the Board's decision granting the petitioners the relief they sought.

¶ 18    In so ruling, we note this court's disagreement with some of the analysis set forth in *Ambrose*. In *Ambrose*, at issue was whether the signature sheets that were submitted in favor of a detachment petition were insufficient because the addresses listed on the signature sheets did not perfectly match the addresses listed on the signers' official voter registrations cards. *Ambrose*, 274 Ill. App. 3d at 683. Specifically, the addresses at issue omitted such words as "avenue," "street," and "road." *Id.* The *Ambrose* court determined that the word "match" in section 7-1 meant "that the identity of the registered voter must be capable of being determined." *Id.* at 684. Based on this interpretation of section 7-1, the *Ambrose* court concluded that the signatures at issue did not have to be stricken, because the discrepancies between the signature sheets and the official registration cards were minor and it was possible to determine whether there was a "match" so that the identities of the signers could be ascertained. *Id.*

¶ 19    We do not disagree with the result in *Ambrose* as it is apparent that the addresses in dispute in that case were in substantial compliance with section 7-1. However, we believe that the *Ambrose* court's definition of the term "match" is too narrow, in that this definition does not promote the principle that signature requirements are incorporated into various statutes so as to deter fraud and to protect the integrity of the political process. See *DeFabio*

-6-

*v. Gummersheimer*, 192 Ill. 2d 63, 68-69 (2000). In *DeFabio*, an election judge failed to comply with the statute and write his initials on ballots that had been cast in a particular precinct. The circuit court invalidated all of the ballots that had not been properly initialed and the supreme court subsequently affirmed, explaining:

" 'As our statute makes it absolutely necessary that every ballot shall bear the official endorsement in the manner aforesaid, we must hold that the election in this case was void, although there is no evidence in the record that discloses any fraud or intended fraud upon the part of the election judges. We think it would be a very dangerous rule to establish that the election judges may disregard the plain provisions of this statute, and thereby defeat the intention of the law to prevent actual frauds from being committed in elections and to disarm the constituted authorities of the efficient means provided by the statute for detecting such frauds. Such salutary laws should not be repealed, in effect, by the action of election judges simply because their mistakes are innocent or because an honest voter may lose his vote by holding such mistakes fatal. It is more preferable that a voter should lose his vote by the innocent action of the judges and by his own neglect to see it that he votes a ballot properly endorsed by a judge, than to open the doors to wholesale fraud and corruption. Every voter is presumed to know the law, and by proper care on his part he can know, and should know, that the ballot delivered to him is properly endorsed by one of the election judges with his own initials.' " *Id.* (quoting *Laird v. Williams*, 281 Ill. 233, 241-42 (1917)).

¶ 20 Here, as stated above, the plain language of section 7-1 provides that the signature in the petition shall match the official signature on file. Not only is this to ensure that the identity of the registered voter can be determined, it is also to ensure that the doors to fraud and deceit are not opened. See *id.* As the petitioners failed to file the requisite signatures, the Board did not have jurisdiction to consider their petition. To hold otherwise would thwart the clear purposes of the statute. Accordingly, the circuit court properly reversed the Board's decision granting the petitioners the relief they sought.

¶ 21 In so ruling, we reject Justice Birkett's assertion that the circulators' proffered testimony was sufficient to establish the validity of the signatures in question. Initially, we disagree with his determination that, by not objecting to the petitioners' offer of proof that the circulators would testify that the signatures they had collected were authentic, the Districts somehow "stipulated" that the petitioners had submitted enough valid signatures. In making this argument, Justice Birkett relies extensively on criminal law authority. Such authority has limited relevance in the civil dispute before us. See *Board of Education of Indian Prairie School District No. 204 v. Du Page County Election Comm'n*, 341 Ill. App. 3d 327, 334 (2003) (criminal liability and civil liability are very different things as criminal defendants are typically provided more protection than civil defendants). Further, to the extent that such authority is applicable, it is clear that an offer of proof is not equivalent to a stipulation. *People v. Williams*, 329 Ill. App. 3d 846, 856 (2002).

¶ 22 Most importantly, even if the Districts somehow stipulated what the circulators would have testified to, that testimony would not have been sufficient to establish that the signatures at issue were valid. The circulators could testify only that the people who signed the petition represented that they were eligible to sign the petition. The circulators could not testify that

a person signing the petition was indeed the person he or she claimed to be. To find otherwise would open the doors to fraud and deceit. See *DeFabio*, 192 Ill. 2d at 68-69. It would also render the signature requirement of section 7-1(a) meaningless as a circulator's testimony could trump the fact that a signature on a petition bore no resemblance to the voter's official signature. This court, of course, must not interpret any statutory provision as meaningless. See *Madison Two Associates v. Pappas*, 227 Ill. 2d 474, 493 (2008) (Illinois courts must construe statutes so that no part is rendered a nullity).

¶ 23    Finally, I note that I do not disagree with anything that Justice Hutchinson states in her special concurrence. However, as there were not enough valid signatures to confer jurisdiction on the Board, this court may not address any of the other issues that the Districts raise. See *People v. White*, 2011 IL 109689, ¶ 153 (the appellate court should not engage in an analysis of issues that are unnecessary to its resolution of the appeal).

¶ 24                                            CONCLUSION

¶ 25    For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

¶ 26    Affirmed.

¶ 27    JUSTICE HUTCHINSON, specially concurring.

¶ 28    I agree with Justice Schostok that the petitioners failed to submit enough valid signatures to confer jurisdiction on the Board. Even if enough signatures had been submitted, however, I note that the trial court correctly determined that the petition for detachment was without merit. This conclusion becomes inescapable once the applicable law and the evidence in this case are considered.

¶ 29    School district boundary changes are governed by section 7-1 *et seq.* of the School Code (105 ILCS 5/7-1 *et seq.* (West 2010)). Section 7-6(i) of the School Code provides that, at a hearing on a petition for detachment and annexation, the regional board of school trustees:

> "shall hear evidence as to the school needs and conditions of the territory in the area within and adjacent thereto and as to the ability of the districts affected to meet the standards of recognition as prescribed by the State Board of Education, and shall take into consideration the division of funds and assets which will result from the change of boundaries and shall determine whether it is in the best interests of the schools of the area and the educational welfare of the pupils that such change in boundaries be granted." 105 ILCS 5/7-6(i) (West 2010).

¶ 30    The parties seeking annexation and detachment have the burden of proving that "the overall benefit to the annexing district and the detachment area clearly outweighs the resulting detriment to the losing district and the surrounding community as a whole." *Carver v. Bond/Fayette/Effingham Regional Board of School Trustees*, 146 Ill. 2d 347, 356 (1992). Petitioners must prove their case by a preponderance of the evidence. See 5 ILCS 100/10-15 (West 2010). The party bearing the burden of proof retains throughout the proceedings the

-8-

burden of persuasion as to the facts underlying its claim. *Ambrose v. Thornton Township School Trustees*, 274 Ill. App. 3d 676, 680 (1995). The party also bears initially the burden of production, which it satisfies by presenting sufficient evidence on each element of its cause of action to establish a *prima facie* case. *Ambrose*, 274 Ill. App. 3d at 680. A *prima facie* case is established by evidence that would enable the trier of fact to find each element of the cause of action more probably true than not. *Anderson v. Department of Public Property*, 140 Ill. App. 3d 772, 778 (1986). If the opposing party produces no evidence that contradicts or impeaches this evidence, the trier of fact must rule for the burdened party. *Anderson*, 140 Ill. App. 3d at 778.

¶ 31        The regional board of school trustees' decision on a petition for detachment and annexation is an administrative decision for purposes of the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2010)). A reviewing court considers the factual findings of an administrative agency to be *prima facie* true and correct. 735 ILCS 5/3-110 (West 2010). The reversal of an administrative agency's factual finding is warranted only where the finding is against the manifest weight of the evidence, *i.e.*, it is clearly evident that the agency should have reached the opposite conclusion. *City of Freeport v. Illinois State Labor Relations Board*, 135 Ill. 2d 499, 507 (1990); *Pochopien v. Regional Board of School Trustees of the Lake County Educational Service Region*, 322 Ill. App. 3d 185, 193 (2001). When we review an administrative order that involves mixed questions of fact and law, the proper standard of review is "clearly erroneous." *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). Decisions of an administrative agency on questions of law, such as the interpretation of a statute, are reviewed *de novo. City of Freeport*, 135 Ill. 2d at 507.

¶ 32        In applying the "benefit/detriment test," regional boards and the courts reviewing their actions should consider the following factors: (1) the differences between school facilities and curricula; (2) the distances from the petitioners' homes to the respective schools; (3) the effect detachment would have on the ability of either district to meet the state's standards of recognition; (4) the impact the proposed boundary change will have on the tax revenues of both districts; and (5) whether a detaching district will remain financially healthy and able to meet state standards of recognition. *Carver*, 146 Ill. 2d at 356; *Dukett v. Regional Board of School Trustees*, 342 Ill. App. 3d 635, 641 (2003). The mere absence of substantial detriment to either district is not sufficient to support a petition for detachment and annexation. *Carver*, 146 Ill. 2d at 358. However, petitioners need not demonstrate a particular benefit to the annexing district as long as the overall benefit to the annexing district and the detachment area considered together outweighs the resulting detriment to the losing district and the surrounding community as a whole. *Carver*, 146 Ill. 2d at 358 (citing *Board of Education of Golf School District No. 67 v. Regional Board of School Trustees*, 89 Ill. 2d 392, 400-01 (1982)). In the absence of substantial detriment to either district, some benefit to the educational welfare of the students in the detachment area is sufficient to warrant the granting of a petition for detachment. *Carver*, 146 Ill. 2d at 358.

¶ 33        The *Carver* court offered some advice regarding the balancing test and the relevant factors. The loss of revenue is not a determinative factor in detachment proceedings and alone will not prevent a boundary change if the district subject to detachment is not levying

at the maximum tax rate. *Carver*, 146 Ill. 2d at 356-57. Although financial loss to the detaching district is not irrelevant, it cannot serve as the basis for a denial of detachment unless it is serious. *Carver*, 146 Ill. 2d at 357.

¶ 34      Educational welfare is broadly interpreted. *Carver*, 146 Ill. 2d at 359. Students' educational welfare is bettered not just through improved educational programs or facilities. *Carver*, 146 Ill. 2d at 359-60. Improvement may occur by way of a shortened distance between students' homes and their school. *Carver*, 146 Ill. 2d at 359-60; see *Pochopien*, 322 Ill. App. 3d at 194 (citing examples of educational welfare).

¶ 35      In addition to the factors set forth above, courts may consider the "whole child" and "community of interest" factors. *Carver*, 146 Ill. 2d at 356. These factors examine "the identification of the petitioning territory with the district to which annexation is sought and the corresponding likelihood of participation in school and extracurricular activities." *Carver*, 146 Ill. 2d at 356.

¶ 36      I turn to a consideration of each of the *Carver* factors.

¶ 37      DIFFERENCES BETWEEN SCHOOL FACILITIES AND CURRICULA

¶ 38      Carolyn Shield, an expert witness on school curriculum, testified that she had compared the curricula of Willowbrook High School (District 88) and Hinsdale Central High School (District 86). She concluded that the curricula in both schools were "substantially the same," although the test scores in District 86 were higher than those in District 88.

¶ 39      Ann Scott, one of the petitioners, testified that she had 10 years' experience in developing youth programs and curricula. Relying on the same documents that Shields had, Scott determined that District 86 offered 26% more advanced placement and honors courses and 31% more total courses than District 88.

¶ 40      No expert testimony regarding the difference in curriculum between Districts 48 and 53 was presented. There was evidence that District 53 had better standardized test scores than District 48. The petitioners extrapolate that District 53 must be better than District 48 because "there is nothing else in the Record to explain the test score differentials between children in the two Districts other than the method of instruction and the quality of the teaching staff." To this point, Districts 48 and 88 respond that there was no evidence in the record to demonstrate that the differences in the test scores will provide any educational benefit to the students.

¶ 41      District 88 further argues that there was evidence (the testimony of Darryl Thompson) that many of the students at Hinsdale Central have their education supplemented by private tutors, which undoubtedly leads to greater academic success and higher school test scores. Further, District 88 had 31% of its students identified as low income in comparison to 4% at Hinsdale. At District 88, 3.5% of the students were identified as having English as a second language while 0.9% had that identification at Hinsdale. At District 88, there was a 7.9% mobility rate (students who would transfer in or out of school) while the mobility rate at Hinsdale was only 3.2%. These factors demonstrate that there are more socioeconomically disadvantaged students at District 88 than Hinsdale, as well as more students who enter or leave the school after freshman year.

¶ 42    In its findings the Board found that "the evidence showed that if the Petition was granted, the facilities of the affected districts would be substantially the same, and that the curriculum would be substantially the same." Such a finding cannot be said to be against the manifest weight of the evidence. Such a finding would also weigh against granting the detachment petition.

¶ 43    DISTANCE FROM PROPOSED DETACHMENT AREA TO SCHOOLS

¶ 44    The evidence showed that the distances from the detachment area to the schools in District 48 were somewhat similar to the distance to the Butler school. However, the distance from the detachment area to Hinsdale Central High School is considerably longer than it is to Willowbrook High School. According to a school bus driver (Patricia Wudi), the travel from the area to Willowbrook High is between 14 and 15 miles and takes 27 to 33 minutes (including bus stops). If she did not make any bus stops and drove directly to Willowbrook High from the area, the trip would be about 6½ miles and would take her 12 to 14 minutes. If she drove straight to Hinsdale Central High School, it would take her approximately 27 minutes. Given her experience in planning and driving bus routes, she thought that, because of the cost, it would be highly doubtful that a bus to Hinsdale Central High School would be dedicated solely to the children of the detachment area. She testified that, if regular bus stops were made, it would take much longer than 27 minutes to reach Hinsdale Central High School.

¶ 45    Further, according to the school bus driver, the route to Hinsdale Central has significantly more safety hazards than the route to Willowbrook High School, including several major intersections, exits from the expressway, and rough railroad crossings. The route to Willowbrook High School has minimal exposure to major highways, no railroad crossings, and far fewer safety obstacles than the route to Hinsdale Central. The regional superintendent's report stated that "new and young drivers will be driving farther distances for those times bus transportation is not provided for after school sports and activities."

¶ 46    The Board found that "issues such as distance of the petitioning territory to all of the schools and school bus availability to be relatively equal in terms of any effect on the districts." This finding was against the manifest weight of the evidence. Wudi's testimony clearly indicated that Hinsdale Central High School was approximately twice as far away from the Timber Trails subdivision as Willowbrook High School was. This factor weighs against detachment.

¶ 47    EFFECT BOUNDARY CHANGE WOULD HAVE ON TAX REVENUE

¶ 48    District 48 presented evidence that it is having financial struggles. For the 2011-12 fiscal year, it was projecting a $209,000 deficit, even without the detachment. District 48 is at maximum tax rates (under the property tax extension limitation law) and has a history of five failed referendums to increase its tax rates. If the detachment petition were approved, using the calculations of the petitioners' witness, Jim Scott, the detachment would present a loss of at least $442,519 annually in tax revenues. If District 48 were to lose that much revenue, it would have to cut special services for low income people as well as services for its gifted

-11-

program.

¶ 49    District 88 would lose approximately $614,503 if the detachment petition were granted. District 88 pointed out that, the year before the detachment hearing, it had reduced its teaching staff by 30, reduced the supplies that it was purchasing, reduced travel expenses, reduced contractual obligations with outside vendors, and reduced the number of custodians, clerical staff, and office assistants in order to save approximately $3 million. District 88 argued that it was already operating on a severely lean budget; any future cuts will be to teachers.

¶ 50    The Board found that the "loss of tax revenue to the detaching districts was minimal when compared to the schools' overall budgets." (The record reveals that the loss of tax revenue at issue made up about 2% of District 48 and District 88's respective budgets.) The Board further stated that it had

> "considered the credibility of the financial testimony and evidence presented by the objecting school districts and found that evidence to be flawed, presenting a skewed calculation of the possible financial loss to the districts. [We] found that the explanation for these inaccuracies was less than sufficient to support the objectors' claim of dire consequences if the Petition was granted."

¶ 51    The loss of tax revenue must be considered in the context of the detaching district's tax rates; if the district is levying the maximum rates and thus cannot increase its revenue, the detachment might be unduly severe. *Richmond v. County Board of School Trustees*, 93 Ill. App. 2d 142, 145 (1968). A substantial reduction in tax revenue to the detaching district, with a corresponding adverse financial impact, can represent a significant reason to reject a detachment petition. *Oakdale Community Consolidated School District No. 1 v. County Board of School Trustees*, 12 Ill. 2d 190, 193 (1957).

¶ 52    The Board's decision on this point was against the manifest weight of the evidence. Even if District 48 overstated how much money it would lose and its overall poor financial condition (there is no allegation that District 88 overstated its poor financial condition), the facts remain that both Districts 48 and 88 would lose a significant amount of money (at least $442,519 for District 48 and $614,503 for District 88) at a time when both were struggling financially. This factor weighed against detachment. See *Oakdale*, 12 Ill. 2d at 193; *Richmond*, 93 Ill. App. 2d at 145.

¶ 53           ABILITY TO MEET STATE STANDARDS OF RECOGNITION

¶ 54    The Board found that "the evidence showed that the effect of the detachment would have little impact on the ability to meet state standards of recognition." District 88 does not specifically refute this finding. District 48 argues that, in light of its recent budgetary cuts, if it had to make additional cuts due to the detachment petition, it would have a difficult time in the future meeting state standards. District 48 raises a seemingly valid concern; at the least, it would mean that this factor weighs against detachment.

¶ 55           WHOLE CHILD AND COMMUNITY INTEREST FACTORS

¶ 56 The Timber Trails subdivision is in an isolated area. All of the students in the subdivision go to the same school system. From the testimony at the hearing, it could be deduced that the residents do not have a lot of interaction with Oak Brook (the area where Districts 48 and 88 are) or the Hinsdale area, where the students would attend if the detachment petition were granted. Kelly Schmidtke, the only affected student to testify, stated that her friends and community are tied to Districts 48 and 88. She further testified that the majority of her friends are from Villa Park. She believed that this was because there are not a lot of school-aged children in the Timber Trails area and most of the school-aged children do not go to public school with her.

¶ 57 The Board found:

"[I]n considering evidence related to the community interest factors, the community cohesiveness of the Petitioners with the Oakbrook area and the ability to connect families and children with the area they live in, participate in carpooling with neighbors, library and park district use, and other facilities they use was a strongly considered factor in favor of granting the Petition."

¶ 58 The "whole child" factor recognizes that extracurricular participation in social, religious, and commercial activities is important in a child's development as a beneficial supplement to the child's academic involvement. *Golf*, 89 Ill. 2d at 398. If a child attends school in his or her natural community, it enhances not only his or her educational opportunity but encourages his or her participation in social and other extracurricular activities that figure importantly in the "whole child" idea. *Golf*, 89 Ill. 2d at 397. The "community of interest" factor looks at whether the petitioning area is identified with the school district and the community to which annexation is requested. *Golf*, 89 Ill. 2d at 397-98. This factor figures importantly with the "whole child" concept in determining the benefits and detriments to the school districts involved in a section 7-6 detachment petition. *Pontiac Township High School District No. 90 v. Regional Board of School Trustees*, 183 Ill. App. 3d 885, 890 (1989). It is also appropriate to consider the personal preferences or convenience of the petitioning parents and their children; however, more than the personal preferences on the part of the petitioners is required for a change in school district boundaries. *Board of Education of St. Charles Community Unit School District No. 303 v. Regional Board of School Trustees of the Kane County Educational Service Region*, 261 Ill. App. 3d 348, 364 (1994).

¶ 59 Here, regardless of whether the detachment petition were granted, the residents of Timber Trails would continue to live in an isolated subdivision. Their connections to the new school system community would not be that different from those with their existing school system community. Most likely, their connections to the new school system community would be weaker since it is farther away than the existing school system community. As such, since these factors show no improvement over the status quo, they do not weigh in favor of detachment.

¶ 60 CONSIDERATION OF FUTURE CHILDREN

¶ 61 In its findings, the Board stated:

"[I]f the Petition was not granted, it would negatively impact future children in the

neighborhood by sending them to different schools than their neighbors and that some neighborhood children could join the same T-ball team or participate in other library and park district programs as their neighbors because of the school district separation."

¶ 62    In reversing the Board's decision, the circuit court specifically stated that the Board erred in considering the impact on future children over the children who were presently living in the proposed detachment area.

¶ 63    Each detachment case should be determined on the basis of the facts and the record presented as opposed to speculative observations. *Wheeler v. County Board of School Trustees*, 62 Ill. App. 2d 467, 476 (1965). The effect of the detachment petition on children currently attending school should be considered over the possible impact on future children. *Fixmer v. Regional Board of School Trustees*, 146 Ill. App. 3d 660, 665-66 (1986); see also *Phillips v. Special Hearing Board*, 154 Ill. App. 3d 799, 807 (1986) (the preferences of the most directly impacted persons should be strongly considered).

¶ 64    Here, the vast majority of people who were sending their children to public school, or who themselves were public school students, testified against the detachment petition.[3] Karen Schmidtke testified that she had a son attending Salt Creek elementary school and that requiring him to change schools would adversely affect him. Kelly Schmidtke testified that she was attending Willowbrook High School and that it would be very difficult for her to switch schools. Diana Kaye testified that her son was extremely depressed over the thought of having to switch schools and that she believed a switch would be devastating to him. John Lapinski testified that it would not be in his children's best interests to be removed from the only school system that they have ever known.

¶ 65    As such, even if future students would arguably benefit from changing school districts, it is clear that such a change would negatively impact current students. Thus, this factor weighs against detachment. See *Dukett v. Regional Board of School Trustees*, 342 Ill. App. 3d 635, 642 (2003) (the benefit of maintaining the same educational setting for children is considerable as disrupting children's lifestyles would not serve to benefit anyone).

¶ 66                    SUMMARY OF *CARVER* FACTORS

¶ 67    Most, if not all, of the relevant factors indicated that the detachment petition should not be granted. The Board's decision to grant the petition was therefore against the manifest weight of the evidence.

¶ 68                    CONSIDERATION OF IMPROPER EVIDENCE

¶ 69    I also note that the Districts complain that, at the hearing on the detachment petition, the

---

[3]Only two parents of public school students testified in favor of detachment: Mary Olszewski and Robert Ludwiak. However, Olszewski testified that she was not unhappy with Salt Creek schools and had no concerns with the district. Ludwiak testified that he thought Hinsdale was more interested in working with parents, but he had never been to the Willowbrook High School and had no knowledge concerning its curriculum offerings.

-14-

Board allowed 27 people to "testify" during public comment without being sworn under oath or subject to cross-examination. Some of the people who "testified" had signed the detachment petition and therefore were actual parties to the proceeding. The Districts acknowledge that the Board stated on the record that it did not consider the comments at issue. However, as the comments were "pervasive," the Districts contend that it was "human nature to recall and process the statements made at the beginning of each hearing session." Thus, as it was impossible for the Board not to consider all the prejudicial evidence that was presented at the hearing, the Districts insist that the Board's consideration of improper evidence is another basis to reverse its decision.

¶ 70    Fundamental due process principles apply to administrative hearings. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 92 (1992). When reviewing an administrative order, the court has a duty to examine the procedural methods employed at the administrative hearing, to ensure that a fair and impartial procedure was used. *Abrahamson*, 153 Ill. 2d at 92-93. "A fair hearing before an administrative agency includes the opportunity to be heard, the right to cross-examine witnesses, and impartiality in ruling upon the evidence." *Abrahamson*, 153 Ill. 2d at 95.

¶ 71    "It is fundamental that a decision pursuant to an administrative hearing must be based upon testimony and other evidence received at the hearing and that a conclusion influenced by extraneous considerations must be set aside." *Des Plaines Currency Exchange, Inc. v. Knight*, 29 Ill. 2d 244, 247 (1963). Parties before an administrative body exercising quasi-judicial powers are entitled to have that body base its decision upon the facts disclosed by the evidence, and a failure of such body to acquaint itself with the facts as revealed by the evidence, if proved, is sufficient grounds to warrant setting aside its order. *Knight*, 29 Ill. 2d at 247-48.

¶ 72    Here, the extensive comments that the Board allowed during the public comment stage of the hearing were clearly improper. As "[t]he overarching objective of [an administrative hearing] should be to create a procedure that provides for and safeguards the due process rights of the interested parties" (*People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164, 188 (2002)), I encourage the Board to adopt a procedure that allows all substantive comments made at an evidentiary hearing to be subject to cross-examination.

¶ 73    For these reasons, I specially concur.


¶ 74    JUSTICE BIRKETT, specially concurring.

¶ 75    I agree with my colleagues that the order of the Board granting the petition for detachment must be reversed. However, I respectfully disagree with their finding that petitioners failed to file the requisite number of valid signatures to confer jurisdiction. The Board's decision on the questioned signatures is a factual matter that does not permit a *de novo* assessment of the evidence. Having determined that the Board had jurisdiction, I would reach the merits and hold that the Board's decision to grant the petition was against the manifest weight of the evidence.


¶ 76                              ADDITIONAL BACKGROUND

-15-

¶ 77    The Districts filed "Objections to and Motion to Dismiss Petition for Detachment and Annexation" in which they argued that 97 signatures on the petition "should be deemed invalid because the signer's signature is not *genuine* when compared with his or her signature on file at the Commission." (Emphasis added.) In their reply to the petitioners' response, the Districts requested that the Board delegate the task of conducting "*signature verification*" to the Election Commission because the Commission has experience in comparing disputed signatures with "verified voter registration cards to determine *authenticity* of the disputed signatures." (Emphases added.) The Districts also pointed out that this process of delegating the task to the Commission would save time and expense. The Districts maintained that, by providing the pages of the petition containing the questioned signatures, along with copies of the corresponding voter registration signatures, they had "provided evidence to rebut any presumption that the signatures on the petition are *genuine*." (Emphasis added.) The Districts cited section 8-1501 of the Code of Civil Procedure for the proposition that "it is proper for the trier of fact to determine whether handwriting is genuine, without expert opinion, based upon proven and disputed handwriting samples." See 735 ILCS 5/8-1501 (West 2010).

¶ 78    The "Committee of Ten" objected to the Districts' proposal to delegate signature verification to the Election Commission. Citing to section 7-2.6 of the School Code (105 ILCS 5/7-2.6 (West 2010)), the Committee of Ten requested a hearing on the Districts' motion before the Board.

¶ 79    On January 10, 2011, the Board conducted a hearing on the Districts' motion to dismiss. The Districts indicated that they had no witnesses. The petitioners announced that they had 14 witnesses. There was a discussion as to whether the Board would hear testimony. Board member Ms. Pollastrini indicated that the decision had been made to limit testimony and "basically" go on the briefs. Board member Mr. Whelan then called upon the attorney for the Committee of Ten, Mr. Stull, to make an offer of proof so the Board could determine if they wanted to accept it. Mr. Stull then provided an offer of proof that the 14 circulators would testify to the following:

    "We would have presented these circulators, who would have provided testimony this evening that they, in fact, were the circulators of these signature petitions that were attached to the packet in the orange-covered volume, Pages 1 through 90; that, in fact, they swore and attested to a circulator's oath, in the presence of an Illinois Notary Public; that all of the individuals that signed those various sheets were, in fact, registered voters that resided in the petitioning territory; that all of the signatories signed in their presence; that all of those signatures were, in fact, valid; that they witnessed those signatures; and that they so attested as part of their notarial oath.

    That would be the sum and substance of their testimony, that all of the 256 signatures that were submitted were, in fact, valid.

    We would further offer testimony that the strike-through signatures, of which there are seven on the sheets–there are seven that are identified by a line striking them through ***; and that those seven signatures were not counted in the total 256, which can be verified simply by counting the number of valid signatures on the sheets numbered 1 through 90. Further, we would not offer testimony of these witnesses."

¶ 80        Board president Ms. Rogers then asked whether the Board wished to hear testimony regarding the signatures. Mr. Whelan then made a motion "that we accept the offer of proof as proffered." Ms. Pollastrini seconded the motion. It was then explained by Mr. Whelan and the assistant State's Attorney that accepting the offer of proof means that "we don't hear witnesses" and "you'll just, basically, take what Mr. Stull said here at face value." Mr. Whelan then indicated that "[t]he only caveat that I would ask is the Chair to give the respondents the opportunity to respond to that, if they want, you know, *in any form or fashion*." (Emphasis added.) The motion to accept the offer of proof was approved by unanimous vote. The Districts' attorneys raised no objection to this procedure. Instead, Mr. Wilson, on behalf of District 48, simply argued that "there should not be witnesses at this type of hearing." He argued that "it's a fairly straightforward process–look and see if there is a match." Mr. Boyle, on behalf of District 88, argued that "the School Code does not allow for the consideration of witness testimony." Neither Mr. Wilson nor Mr. Boyle cited any case law in support of the contention that live testimony was not permissible on the question of whether signatures on the petition "match the official signature and address of the registered voters as recorded in the office of the election authority." See 105 ILCS 5/7-1(a) (West 2010). Mr. Wilson argued that "the testimony of the circulators really has no bearing in this particular proceeding." He argued that "[i]f, when I sign a petition and I'm left-handed, if I decide to sign it right-handed and my signature doesn't match the signature card, it's not gonna [*sic*] be counted."

¶ 81        Board member Ms. Scigousky asked why the Districts were "not trusting the circulators." In response, Mr. Boyle stated that "[t]he School Code is straightforward. The School Code requirement doesn't depend on any witness testimony. So, whether I trust the circulator or not is immaterial." Mr. Whelan indicated that the Board would look at the signatures but would also consider the proffer made by Mr. Stull for "whatever consideration that it's due."

¶ 82        In response to the Districts' arguments, Mr. Stull argued that the Districts had the burden to rebut the presumption of the validity of the signatures. He argued that the Districts provided "no evidence at all–no witness testimony." Mr. Stull pointed out that signatures change over time and that "[s]ome of the registered voters have been registered voters for over 30 years." Mr. Stull pointed out that the circulators' testimony also would have described their review of the petition, which included striking out any signatures that were questionable. Mr. Stull argued that "[a]ll 256 of our signatures are valid." Lastly, he argued that "[i]f there was a legitimate question raised by the Districts, why didn't they contact a single signatory or a single circulator, if they had a question?"

¶ 83        In response to Mr. Stull's argument, the Districts argued again that the Board did not need testimony and that the Board could make the decision simply by comparing the disputed signatures with the signatures on file with the Election Commission. Mr. Boyle also added that the notarized signatures on the petition were the signatures of only the circulators, not the people whose signatures "appear on that page of the petition." Mr. Stull pointed out that the circulator's oath disclosed the verification that the "signatures on this sheet were signed in my presence on the date indicated and are genuine." Mr. Boyle added that the oath also included this sentence: "And to the best of my knowledge and belief, that the persons so signing were, at the time of signing the petition, registered voters residing in the petitioning

-17-

territory, based upon information obtained from the Election Commission of Du Page County." After deliberating in closed session, the Board voted unanimously to deny the Districts' motion to dismiss.

¶ 84                                    ANALYSIS

¶ 85    I disagree with my colleagues that our review of the Board's decision regarding the requisite number of valid signatures is *de novo*. In Illinois, as in the majority of jurisdictions, the determination of genuineness/authenticity of handwriting and/or a signature is for the finder of fact. "Findings of fact are determinations from the evidence of a case, either by a court or an administrative agency, concerning facts averred by one party and denied by another." (Internal quotation marks omitted.) *Perez v. Illinois Department of Children & Family Services*, 384 Ill. App. 3d 770, 774 (2008). In their pleadings before the Board, the Districts maintained that the Board could determine whether the signatures were "genuine" or "authentic" by comparing them to the signatures on file with the Election Commission. "An administrative agency's findings and conclusions on questions of fact are deemed *prima facie* true and correct. In examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of the agency. Instead, a reviewing court is limited to ascertaining whether such findings are against the manifest weight of the evidence. An administrative agency's factual determinations are against the manifest weight of the evidence if the opposite conclusion is clearly evident." *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008).

¶ 86    The Districts were correct in arguing that the Board could make its own determination whether the signatures were genuine (or a match). The Districts were incorrect, however, in arguing that the Board could consider only the signatures. The Committee of Ten, on behalf of the petitioners, correctly pointed out that the Board had the authority to take testimony on the issue of authenticity/genuineness or "match." There is nothing in the School Code that restricts the Board to simply comparing the questioned signatures to the voter signatures on file with the Election Commission, and the Districts have cited no authority to support such a restriction. District 48 cites *Hoxha v. LaSalle National Bank*, 365 Ill. App. 3d 80, 85 (2006), for the proposition that "it is proper for the trier of fact to determine whether handwriting is genuine, without expert opinion, based upon a comparison of proven and disputed handwriting." Likewise, District 88 cites *Hoxha* for the same proposition, but then cites *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446 (2009), and argues that our review of the signatures is *de novo* because the evidence was documentary. *Id.* at 453. My colleagues agree with this argument and have concluded that, because a number of signers used only an initial for a first or last name instead of their full names as reflected on their voter registration cards, their signatures are invalid. The Districts did not make this particular argument before the Board or in their briefs before this court. Rather, their argument is simply that the signatures do not match. In their pleadings below, although the Districts maintained that 97 signatures were bad, they then listed 25 that, they said, *clearly do not match*.

¶ 87    Most states, including Illinois, have adopted evidentiary standards to guide trial courts in determining whether a writing is sufficiently authenticated. "A finding of authentication

-18-

is merely a finding that there is sufficient evidence to justify presentation of the offered evidence to the trier of fact and does not preclude the opponent from contesting the genuineness of the writing after the basic authentication requirements are satisfied." *People v. Downin*, 357 Ill. App. 3d 193, 202-03 (2005). Illinois Rule of Evidence 901(b) (Requirement of Authentication or Identification) provides a nonexhaustive list of methods of authentication, which include the following:

> "(1) Testimony of Witness With Knowledge. Testimony that a matter is what it is claimed to be.

> (2) Nonexpert Opinion on Handwriting. Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

> (3) Comparison by Trier or Expert Witness. Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated.

> (4) Distinctive Characteristics and the Like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Ill. R. Evid. 901(b) (eff. Jan. 1, 2011).

¶ 88    Illinois reviewing courts have historically held that the issue of authorship of a document is for the trier of fact to determine. *Downin*, 357 Ill. App. 3d at 203 (citing *People v. Munoz*, 70 Ill. App. 3d 76, 86 (1979)). Further, when the issue of authorship is before the reviewing court, that issue has been reviewed under a manifest-weight-of-the-evidence standard. See *Shelby Loan & Trust Co. v. Milligan*, 372 Ill. 397, 408 (1939) (in a will contest where the evidence as to authenticity was conflicting, no reversal unless the verdict is contrary to the manifest weight of the evidence). In *Krueger v. Dorr*, 22 Ill. App. 2d 513 (1959), the appellate court held that the mere fact that evidence is conflicting in some respects does not mean that the findings are against the manifest weight of the evidence. The court in *Dorr* also observed that a notary public has the duty to ascertain the truth of the matters about which he or she is to certify. Also, "[p]arties act on the faith of that certificate, and public policy, the security of titles, and the peace of society require that in the absence of fraud and collusion it is entitled to full credit." *Id.* at 528.

¶ 89    In *Canter v. Cook County Officers Electoral Board*, 170 Ill. App. 3d 364 (1988), the appellate court affirmed the decision of the trial court that upheld the board's decision invalidating three sheets of petition signatures. The court said, "in an administrative review proceeding, it is not the function of either the trial court or the appellate court to reweigh the evidence or assess the credibility of the witnesses. [Citation.] Rather, the findings and decision of the electoral board will not be disturbed unless those findings are against the manifest weight of the evidence." *Id.* at 368-69. The board in *Canter* found that on one of the sheets the signatures on "lines 18 through 25 appeared to be written in the same handwriting." *Id.* at 367. On another sheet, the board found, "six names appeared twice, and lines 10 through 25 also appeared to be written in the same hand as that of Hamilton." *Id.* Hamilton was the purported circulator of these sheets. He was subpoenaed to testify at the hearing but refused to do so, invoking the fifth amendment. The objectors in *Canter* called witnesses at the hearing. These witnesses were the purported signers, who testified that several of the signatures on the petition were not valid. *Id.* at 366. In *Benjamin v. Board of*

*Election Commissioners*, 122 Ill. App. 3d 693 (1984), the appellate court stated that "[w]hether a person is a registered voter and whether he or she is registered at the residence address indicated on the nominating petition are both questions of fact." *Id.* at 696. The court also commented that the petitioner did not "produce any affidavits from signatories nor did he call any witnesses to testify that they were registered voters in the 46th Ward and had signed his petition." *Id.* at 695.

¶ 90 The Districts acknowledged before the Board, before the trial court, and before us that they made no independent effort to prove that any of the 97 signatures that they challenge are invalid because they do not match. The Districts did not hire an expert witness to express an opinion as to whether the questioned signatures were in the same handwriting as the signatures on the voter registration cards. According to the Districts, they effectively rebutted the presumption that the signatures were genuine by presenting the questioned signatures along with the voter registration cards for comparison. In my view, this is the type of "hypertechnical" argument that we should be reluctant to embrace in order to avoid the merits. It is clear from the Districts' arguments before the Board that their objection had nothing to do with any contention that the signatures were not genuine. Rather, their arguments were simply that you can look only at the signatures, that even a voter's own words cannot save a nonmatch.

¶ 91 Contrary to my colleagues' conclusion, the petitioners presented unrebutted evidence from the 14 circulators by way of an offer of proof, which was accepted by the Board without objection from the Districts, that the signatures on the petition were genuine. Mr. Whelan made clear to everyone that, by accepting the offer of proof, the Board would consider this evidence as if the circulators testified. The Board has the authority to determine how it will receive evidence. 105 ILCS 5/7-2.6 (West 2010) ("The Hearing Board may administer oaths, determine the admissibility of evidence and issue subpoenas for the attendance of witnesses and subpoena duces tecum for the production of documents."); see *Board of Education of Community High School District No. 94 v. Regional Board of School Trustees*, 242 Ill. App. 3d 229, 234 (1993). It was made clear to the parties that the Board received in evidence and would consider the agreed testimony of the 14 circulators during its deliberations. The Districts did not object to this evidence at the time it was received and their failure to do so results in forfeiture. Prior to deliberations it was made clear again that the Board would consider the proffer. Illinois Rule of Evidence 901(b)(1) provides that testimony of a witness with knowledge is a proper method of authentication. Ill. R. Evid. 901(b)(1) (eff. Jan. 1, 2011). My colleagues say in footnote 2, "[w]e note that either party could have sought to have the people who purportedly signed the petitions testify that the signatures appearing on the petition were in fact (or were not in fact) their signatures." *Supra* ¶ 15 n.2. That is precisely what happened here. The Committee of Ten presented the testimony of the circulators by way of stipulation. While Mr. Whelan used the term "offer of proof" and stated that it would be accepted "as proffered" and would be considered, the Districts, by failing to object, stipulated to this evidence because to them it made no difference what the circulators said. A "stipulation" is an agreement between parties or their attorneys with respect to an issue before the court, and courts look with favor upon stipulations because they tend to promote dispositions of cases, simplifications of issues, and the saving of expense

to litigants. *People v. Woods*, 214 Ill. 2d 455, 468-69 (2005). "A stipulation is conclusive as to all matters necessarily included in it ***." (Internal quotation marks omitted.) *Id.* at 469. Here, there is no question that the Districts knew that the Board would consider the proposed testimony and they failed to object. Stipulation by silence will be found to exist in similar circumstances. See *People v. Blankenship*, 406 Ill. App. 3d 578, 597-98 (2010) (stipulation by silence to street-value fine). The Districts' argument was not directed to the substance of the circulators' testimony but rather to the legal effect. They mistakenly assumed that the Board could consider only the signatures themselves. As such, even if my colleagues' *de novo* review argument is otherwise correct, since the Board's determination was not based entirely on documentary evidence, we must "defer to the Board's credibility determinations and employ a manifest-weight-of-the-evidence standard of review." *Supra* ¶ 15 n.2. As District 48 points out in its statement of facts, "[t]he purported reasoning for this decision was set forth in the Regional Board's January 25, 2011 order." Paragraph 4 of that order reads:

> "That after hearing the arguments and receiving the evidence, the Board moved to enter into executive session to review the challenged signatures and deliberated in closed session to consider testimony and evidence pursuant to 5 ILCS 120/2(c)(4) of the Illinois Open Meetings Act."

The only testimony received was the stipulation to the circulators' testimony.

¶ 92 I have no quarrel with my colleagues' observation that an offer of proof is not equivalent to a stipulation. They cite *People v. Williams*, 329 Ill. App. 3d 846 (2002), for this proposition. In *Williams* there was an oral stipulation between defense counsel and the prosecutor. However, "[t]he police reports mentioned in the oral stipulation were not made a part of the common law record." *Id.* at 856. The stipulation therefore lacked "clarity" and was "an inadequate substitute for impeachment testimony by the police." *Id.* No such problem exists in this case. The stipulation was clear. The Districts did not contest the proposed testimony that formed the stipulation. Instead, they argued that the only thing that mattered was the side-by-side comparison to determine whether there was a "match."

¶ 93 This court recently stated in *People v. Valle*, 405 Ill. App. 3d 46 (2010), that "the rule in *Addison Insurance* is inapplicable when, as here, the trial court has heard live testimony relating to a disputed issue of fact." *Id.* at 56. In *Valle*, the defendant maintained that, because we had video of his interrogation, we were equally situated with the trial court for deciding the issue of voluntariness and therefore our review should be *de novo*.

¶ 94 With all due respect to my colleagues, I do not believe that the rule in *Addison Insurance* was ever meant to apply to handwriting/signature comparisons. I believe that, unlike the situation in *Addison Insurance*, the Board was in a superior position to make factual findings regarding the validity of signatures. It has more experience in weighing such evidence. Further, duplication of the fact finder's efforts will contribute negligibly to the accuracy of factual determinations and divert our scarce judicial resources. See *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 574-75 (1985).

¶ 95 Here, the Districts took the position that the testimony of the circulators was irrelevant to the Board's determination of whether the signatures matched. They even went so far as

to say that, even if the voter who signed his or her name testified that he or she signed, if the signature is different in any material respect it is not a match. For example, they argued that if a person signed his voter registration card with his right hand and the petition with his left hand there would be no match. Such a position is at odds with reality. The Districts had the opportunity to cross-examine the circulators instead of simply accepting the proposed testimony as true. The Board properly considered the evidence in reaching its findings. The role of the circulator ensures fairness and honesty in the petition process. See *Canter*, 170 Ill. App. 3d at 369.

¶ 96     As the Board argues in its reply brief, the process suggested by the Districts would require us to reweigh the evidence and substitute our judgment for that of the Board, a process that is not countenanced in the law. *Board of Education of Golf School District No. 67 v. Regional Board of School Trustees*, 89 Ill. 2d 392, 397 (1982). The question of whether the signatures "match" is a question of fact. I believe that we should apply the same standard of review that has historically been applied in reviewing decisions regarding the genuineness of signatures, including in election cases, which is the manifest-weight-of-the-evidence standard. *Benjamin*, 122 Ill. App. 3d at 696.

¶ 97     While I disagree with my colleagues on the standard of review regarding the signature findings by the Board, I agree with my colleagues that we have a duty to examine the evidence in an impartial manner and set aside a finding that is against the manifest weight of the evidence. I agree with my colleagues that section 7-1 of the School Code requires only substantial compliance. In support of this view that we should apply a *de novo* standard of review to "the Board's decision as to the validity of the signatures," my colleagues use a "see also" citation to *Ambrose v. Thornton Township School Trustees*, 274 Ill. App. 3d 676, 681 (1995). *Supra* ¶ 14. The *Ambrose* court was discussing its review of a specific document, a map, which I submit is far different from the task of comparing a questioned signature to a known standard. *Ambrose* also involved a question of the signature and address requirements of section 7-1. With respect to the decision of the Thornton trustees on that issue, the *Ambrose* court applied the manifest-weight-of-the-evidence standard. *Ambrose*, 274 Ill. App. 3d at 683.

¶ 98     Under either standard of review, to determine whether the Board's decision on the validity of the signatures was proper, we must determine the meaning of the term "match" in section 7-1. 105 ILCS 5/7-1 (West 2010). My colleagues disagree with the interpretation of this term by the *Ambrose* court. They are correct that the precise issue in that case was the address component of the "signature and address" match requirement. The court said in *Ambrose*:

"Reading the School Code as a whole, we conclude that the word 'match' in section 7-1 means that the identity of the registered voter must be capable of being determined. Here, using the signers' names and addresses listed in the petition sheets and the official voter registration lists, it is possible to determine whether they match. We do not require a 'perfect match' as the defendants suggest." *Ambrose*, 274 Ill. App. 3d at 684.

¶ 99     In arriving at this interpretation, the *Ambrose* court relied upon *Board of Education of Wapella Community Unit School District No. 5 v. Regional Board of School Trustees*, 247

Ill. App. 3d 555 (1993). In *Wapella*, a petition was filed with the regional board of school trustees, seeking dissolution of the Wapella district. Objections were filed challenging the validity of 109 signatures on the petition and other aspects of the petition. The regional board held a hearing on the petition. The regional board recited various steps that it had taken to check the validity of the petition and the signatures, but it denied the objectors' request to be heard on their objections. On appeal, the appellate court affirmed the regional board's decision in all respects, except the decision to deny the right of the objectors to be heard. The case was remanded for that hearing. *Board of Education of Wapella Community Unit School District No. 5 v. Regional Board of School Trustees*, 245 Ill. App. 3d 776, 779 (1993). Upon remand, a hearing was held and the regional board found that, although a few of the signatures were invalid, the petition contained enough valid signatures to constitute a majority of the registered voters of the district. *Wapella Community Unit School District No. 5*, 247 Ill. App. 3d at 557.

¶ 100    One of the objectors' complaints concerned the execution of certificates by a circulator named Margaret Marlene Spray. Ms. Spray was registered to vote as *M. Marlene Spray*. She signed a petition circulated by another person as *Marlene M. Spray* and signed the certification on three sheets she had circulated as *M. Marlene Spray*. The court said that "[t]he evidence was undisputed that she was one and the same person who performed *all the acts* involved." (Emphasis added.) *Id.* at 560. As the court noted, Ms. Spray signed the circulator's certificates the same as her voter registration card. The court then said:

"Moreover, presumption of identity of a person has been held to exist when two used surnames are identical but one of the initials in the given name is transposed. (65 C.J.S. *Names* § 15(b)(2), at 47 (1966).) *No signature* to the petition was invalidated by Spray's use of slightly different names." (Emphasis added.) *Id.*

¶ 101    As the court in *Ambrose* said, in ascertaining and giving effect to the intent of the legislature, while we give language in the statute its plain and ordinary meaning, we also read sections of the School Code *in pari materia* in order to give harmonious meaning to the act as a whole. *Ambrose*, 274 Ill. App. 3d at 683. The first paragraph of section 7-1(a) provides that "[r]egistered voters shall be determined by the official voter *registration lists* as of the date the petition is filed. No signature shall be added after the date the petition is filed." (Emphasis added.) 105 ILCS 5/7-1(a) (West 2010). Paragraph 2 of section 7-1(a) describes what the pages of the petition "shall" include. *Id.* To me it is clear that the term "match" means that the circulator in the first instance must make sure that the signatures match up with the names and addresses on the "official voter registration list." I doubt that the circulator of any petition would be in possession of voter registration cards.

¶ 102    We should avoid hypertechnical reasons for avoiding decisions made on the merits when neither party suffered any delay or harm as the result of the hypertechnical violation. See *Seelhoefer v. Regional Board of School Trustees*, 266 Ill. App. 3d 516, 519 (1994). In *Seelhoefer*, the appellants argued that the amended petition failed to comply with section 7-1 of the School Code because (1) the circulator did not sign each page of the petition and (2) the full prayer was not on each page of the petition. The appellate court found that the "appellees substantially fulfilled the requirements of the School Code" and rejected the argument that the regional board and circuit court lacked jurisdiction. *Id.*

¶ 103   There is no question that signatures of the requisite number of voters are essential to jurisdiction. However, not every irregularity in a petition is fatal to jurisdiction. *Id.* Here, the Districts' objection to the petition's signatures is technical. The Districts acknowledged at oral argument that they had an opportunity to investigate the authenticity of the signatures and to present such evidence at the hearing. They chose not to do so, relying instead on visual comparisons of the signatures on the petition with the signatures on the voter registration cards. This technical challenge was rejected by the Board. It appears that the Board must have rejected the Districts' interpretation of the statutory term "match" in finding that there were a sufficient number of valid signatures. I believe that the Board's determination on this issue should not be disturbed unless from our review of the evidence, including the signers' names and addresses, the voter registration lists, the voter registration card signatures, and the agreed testimony of the circulators, the identities of the signers are not "capable of being determined." *Ambrose*, 274 Ill. App. 3d at 684.

¶ 104   Requiring a perfect match, for example invalidating any signature that used an initial as opposed to a full first name, is inconsistent with the legislative intent, which is to delegate to the local level the discretionary power to decide issues of detachment and annexation. See *Hepner v. County Board of School Trustees*, 8 Ill. 2d 235, 240-42 (1956). "[T]he intent of the signature and address requirements is to guarantee that petitioners are supported by the required number of voters in a given area." *Ambrose*, 274 Ill. App. 3d at 684 (citing *Greene v. Board of Election Commissioners*, 112 Ill. App. 3d 862 (1983)). If the requisite number of voters is "capable of being determined" we should reject the Districts' argument and decide the case on the merits.

¶ 105   This definition recognizes the reality that people are not machines. Our handwriting and signatures change from one moment to the next. Internal physiological factors, along with external influences, constantly affect our writing processes. See 27 Am. Jur. Proof of Facts 3d § 41 (1994).

¶ 106   As my colleagues point out, the Board must not have agreed with the Districts' position so it therefore must have determined that an initial used in combination with a first or last name was acceptable as long as from the evidence presented the identity of the voter could be determined. The Board's interpretation of the statute is not binding on this court as we review questions of law *de novo*. "However, courts 'must give substantial weight and deference to statutory interpretations made by an administrative agency charged with administration of a particular statute.' " *Boylan v. Matejka*, 331 Ill. App. 3d 96, 98 (2002) (quoting *Oregon Community Unit School District No. 220 v. Property Tax Appeal Board*, 285 Ill. App. 3d 170, 175 (1996)). "When a statute is ambiguous, it will be given a construction that is reasonable and that will not produce absurd, unjust, or unreasonable results which the legislature could not have intended." *In re Application of the County Collector of Du Page County for Judgment for Taxes for the Year 1993*, 187 Ill. 2d 326, 332 (1999) (citing *Collins v. Board of Trustees of the Firemen's Annuity & Benefit Fund*, 155 Ill. 2d 103, 110 (1993)). In discerning the meaning of the term "match" we should consider which interpretation better effectuates the legislative intent and is more consistent with the goals of the legislation of which this provision is a part. *Id.*

¶ 107   The legislative intent of section 7-1 is to leave to the resident voters the settlement of all

questions involving school district territory. *People ex rel. Smail v. Board of Education of Community Unit School District No. 202*, 343 Ill. App. 362, 370 (1951) (citing *People v. Deatherage*, 401 Ill. 25, 41 (1948)). The second paragraph of section 7-1(a), which includes the questioned language, was added in 1983 by Public Act 83-733 (eff. Sept. 23, 1983). It appears clear to me that the legislature added the provision in order to provide a method of authentication to local boards, much the same as the language in our Election Code that provides that voter signatures on absentee ballot envelopes "match" the signatures on file with the election authority. 10 ILCS 5/19-8(g) (West 2010). If a ballot is rejected, the voter is notified of the reasons for rejection and he or she is given an opportunity "to show cause as to why the ballot should not be rejected." 10 ILCS 5/19-8(g-5) (West 2010). This process safeguards the integrity of the voting process and at the same time protects the individual voter's right to vote. I view the petition process in section 7-1 of the School Code in much the same way. 105 ILCS 5/7-1 (West 2010). The Districts made their general objection that 97 signatures did not match. The petitioners through the Committee of Ten were provided an opportunity to show cause why the challenged signatures should be determined to be valid. This process safeguards the resident voters' rights to participate in disputes regarding school boundaries and it deters fraud. My colleagues' concerns as expressed in paragraph 19 are satisfied by the process followed by the Board in this case. As the court stated in *Shelby Loan*, "[t]he general rule is that where forgery and fraud are charged, courts permit evidence to take a wide range and every fact and circumstance, no matter of how little probative value, which throws any light on the issue, is admissible." *Shelby Loan*, 372 Ill. at 407.

¶ 108    Before discussing my view of the Board's finding that there were a sufficient number of valid signatures, I will comment on the out-of-state cases the majority relies upon to conclude that variations in signature do not meet the substantial compliance requirement. Both cases are distinguishable. The majority cites *In re Nomination Petition of Flaherty*, 770 A.2d 327 (Pa. 2001), from the Supreme Court of Pennsylvania, for the proposition that "[s]ubstantial compliance will not be found if one uses an initial for a first or last name." *Supra* ¶ 16; see *Flaherty*, 770 A.2d at 332. Actually, the *Flaherty* court struck signatures because they were printed rather than cursive as they appeared on the voter registration cards. However, my colleagues fail to note that the court struck these signatures because, in the absence of "substantial proof that the person intended her printed name to be her signature, a person may not validly print her name upon a nomination petition." *Flaherty*, 770 A.2d at 332.

¶ 109    The *Flaherty* court noted that other signatures were stricken "based on the following reasons: the signatures were illegible, the signature on the petition did not match the signature on the electors' registration card, the signatures were printed and *Candidate did not offer any rehabilitating testimony*, or the electors were not registered and *Candidate failed to present rehabilitating testimony*." (Emphases added.) *Id.* at 331 n.4. Here, the petitioners did offer "rehabilitating" testimony from the circulators.

¶ 110    Next, my colleagues cite *State ex rel. Rogers v. Taft*, 594 N.E.2d 576 (Ohio 1992), for the proposition that "substantial compliance will not be found if the signature is printed rather than in cursive as it appears on the corresponding registration form." *Supra* ¶ 16. The Supreme Court of Ohio made this determination because, based on the language in the

-25-

relevant Ohio statute, "the General Assembly obviously did not mean to include printing within the term 'signature' as used in the statute, since the relevant law clearly distinguishes the two." *Taft*, 594 N.E.2d at 579. Under the Ohio statute at issue, "[s]ignatures shall be affixed in ink. Each signer may also print his name, so as to clearly identify his signature." (Internal quotation marks omitted.) *Id.* The court noted that in *State ex rel. Green v. Casey*, 554 N.E.2d 1288, 1290 (Ohio 1990), it held that this provision "implicitly requires a cursive signature." *Taft*, 594 N.E.2d at 579. The provision at issue in this case does not provide this distinction. With respect to one of the contested signatures, the *Casey* court also noted that there was "no proof offered that the signer and the registered voter were the same persons." *Id.* Again, in this case there was proof that the signers and the registered voters were the same persons.

¶ 111    I also note that, in both out-of-state cases that my colleagues rely upon, the courts applied a more deferential standard of review. In *Flaherty*, the court stated, "our standard of review is whether the findings of fact are supported by substantial evidence, whether there was an abuse of discretion, or whether errors of law were committed." *Flaherty*, 770 A.2d at 331. In *Taft*, the court, in affirming the election board's refusal to accept a candidate's nominating petition, stated: "we find no fraud, corruption, abuse of discretion, or clear disregard of the law in the board's rejection of these signatures." *Taft*, 594 N.E.2d at 580.

¶ 112    I have reviewed the questioned signatures, along with the addresses and the other information on the petition sheets, and compared the signatures to the signatures on file with the election commission. There is no question that the 21 signatures identified by my colleagues leave a lot to be desired. Circulators, whether they are working to get a candidate on the ballot or to raise a public question, would be well advised to remind voters to sign their full names. As an aside, I also note that the State Board of Education provides public education online and in print regarding "School District Detachment/Annexation" but that no information concerning the "match" requirement for signers is contained therein. That said, I would hold that the Board's decision that the petition had met the signature requirement is not against the manifest weight of the evidence, as the opposite conclusion is not clearly evident. *Cinkus*, 228 Ill. 2d at 210.

¶ 113    It is important to remember that marks of different sorts may qualify as signatures, as long as the mark "manifests that the instrument has been executed or adopted by the party to be charged by it." (Internal quotation marks omitted.) *Roti v. Roti*, 364 Ill. App. 3d 191, 196 (2006). The petitioners, through the Committee of Ten, presented a *prima facie* case for jurisdiction to be found. The burden of production shifted to the Districts to show that the petitioners did not present the requisite number of signatures. The Districts presented the questioned signature pages along with the official voter registration card signatures. In order to counter the Districts' claims, the Committee of Ten presented the testimony of the circulators by way of an accepted proffer, which has the legal effect of a stipulation. The Districts' arguments against the relevance of the stipulated evidence are not evidence. As my colleagues acknowledge, testimony as to the genuineness of the signatures is admissible on the question of whether they match the official signatures.

¶ 114    Additionally, it appears from the petition sheets that they were the product of door-to-door canvassing by the circulators. Many of the signatures that my colleagues invalidate due

to the use of an initial appear on the same petition sheets as signatures of other voters in the same household who signed on the same date as the purported bad signer. Even in those instances where an initial is used, in most cases the signature in its entirety bears a strong resemblance to the signature on the voter registration card. It would be reasonable for the Board to conclude that the petition corroborated the circulators' agreed testimony that the signatures were genuine. In my review of the signatures I saw nothing that would indicate fraud or forgery. This perhaps explains why the Districts made no attempt whatsoever to independently ascertain from the signers whether their signatures on the petition were "genuine," the term they repeatedly used in their initial pleadings. It also helps to explain why the jurisdictional argument is the last argument raised in the Districts' briefs and why they never bothered to touch upon the signature issue during the arguments before the trial court. For all of the foregoing reasons I would affirm the Board's finding that the signature and address requirement was met and move on to the merits.